Hon. Denis R. Hurley
U.S. Dist. Judge
U.S. Dist. Court
100 Federal Plaza
Central Islip, N.Y. 11722

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ DEC 1 0 2012 ★    11/16/12

LONG ISLAND OFFICE

RE: Hill · V. USA, 09-CV-4499
Response to Gov. opposition to
2255;

Dear Judge Hurley
            Enclosed is my response to the
Gov. opposition brief to my 2255 to vacate conviction
and sentence.
            Attached is several affidavits and letters
from former counsel Kellman as exhibits that directly
refute her mendacious affidavit.
            I would ask the Court take an
in depth look at this case and hold a evidentiary
hearing.
            Thank you in advance

RECEIVED

DEC 1 0 2012

EDNY PRO SE OFFICE

                In Struggle

                Demetrius Hill

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  DEC 10 2012  ★

LONG ISLAND OFFICE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

      Respondent,

v.                                      Case No.:  0 9-CV-4499
                                        CR-02-0728

DEMETRIUS HILL,

      Defendant.

_____/

## PETITONER'S REPLY TO THE GOVERNMENT'S
## RESPONSE TO TITLE 28 U.S.C. § 2255

    COMES NOW, Petitioner Demetrius Hill, with this Reply to the Government's Response to

the Title 28 U.S.C. § 2255 and in support provides as follows:

> "Indigent defense in the United States remains in a state of crisis, resulting in a system that
> lacks fundamental fairness and places poor persons at constant risk of wrongful convictions.
> And as a result, the integrity of the criminal justice system is eroded and the legitimacy of
> criminal convictions is called into question."

*Id.* ABA and Department of Justice, 87 Crim. L. Rep BNA 706 (July 28, 2010)

## INTRODUCTION

    Demetrius Hill has been incarcerated over ten years, serving a 20 year sentence for

supposedly being a felon in possession of a firearm (18 U.S.C. 922(g); interference with

commerce via *robbery of narcotics traffickers* (18 U.S.C. 1951); and conspiracy to *robbery of*

*said narcotics traffickers* (18 U.S.C. 1951)).

    Not a single "narcotics trafficker" testified at Mr. Hill's trial that he robbed them or anyone

else.  In fact, there are no "victim/witnesses" who attested to ever being robbed by Mr. Hill.  The

government proposes the specious contention that drug dealers would not go to the po**RECEIVE**

**1**

contention that is clearly false as per *United States v. Peterson*, 236 F.3d 848 (7th Cir. 2001). Of the two firearms produced at the trial, not one contained Mr. Hill's fingerprints and a Pastor of a church, who was present during the arrest of Mr. Hill, denied seeing police ever remove any firearm from Mr. Hill's person, and testified to this effect during a suppression hearing conducted. (See, January 24, 2003 Tr. of Pastor Skillings) There were no drugs or robbery proceeds *e.g.* money produced at Mr. Hill's trial – none exists. Hill was not apprehended while committing a robbery of anyone, nor fleeing any robbery scene, and two alleged robbery victims, when shown a photo-array which included Mr. Hill, denied any participation by Hill.

Mr. Hill was convicted after a jury trial – a trial in the year 2005 that consisted of not one single black or Latino person – based on the testimony of Sarah Guzman; Omar Eusty; Naiomi Eusty; Daniel Skillings; [1] Jerry Russell (aka Polite); Cynthia Plummer and a confidential informant which the government refused to disclose his/her identity. All are free in exchange for Mr. Hill's incarceration. Naiomi Eusty testified for her brother "Omar's" freedom. All the remaining testifiers were members of law enforcement.

Mr. Hill was charged and convicted of over 25 robberies in New York and New Jersey, yet not one victim-initiated police report exists. Initially Mr. Hill was represented by Attorney Kevin Keating who was appointed by the Judicial CJA Act on the federal charge of 18 U.S.C. 922(g) firearm count – the only charge in May 2002. The same weapons charge was concomitantly pending in N.Y. State Courts despite the common practice of dismissing the State charge in lieu of the federal case. Since via New York State Constitution such dual conviction would constitute "double jeopardy." Mr. Keating nonetheless demanded and received payment

---

[1] Omar, Daniel, Naiomi are Brother and Sister and related to deceased co-defendant Michael Skillings killed on February 5, 2002, in Candem, New Jersey.

2

for the State weapons charge, which was dismissed *sua sponte* by the State prosecutions office then refused to return said monies.  (See Exhibit A)

After Mr. Hill attempted to fire Keating for refusing to request a "suppression hearing" from the court, Judge Hurley persuaded Mr. Hill to keep counsel, under the court's promise of a prompt suppression hearing and "directing" Keating to file the essential documents.  Keating, clearly upset, filed a deficient motion (after 9 months of waiving the speedy trial clock), which the government argued as such, yet the court overruled the government's arguments, and *sua sponte* supplemented Mr. Hill's affidavit orally on the record in open court – and directed the government to call its first witness for the beginning of the suppression hearing.

After the government called two law enforcement officials, one of which claimed to rely on a <u>confidential informant</u> (hereinafter C.I.) who did not even know Mr. Hill's name and provided no basis of knowledge for his assertion that Mr. Hill and a female companion were in possession of firearms, Hill called a pastor of a church who testified to the excessive police show of force (during the stop of Mr. Hill) *e.g.* a voluminous amount of police guns and personnel presence and testified to being present during the search and seizure of Mr. Hill, and in direct view of the scene and testified that he never observed[2] Mr. Hill in possession of a gun, nor seeing a police officer remove any firearm from Mr. Hill's person.  In a twenty-something page bench decision, Judge Hurley "suppressed" the firearm allegedly recovered.

Cynthia Plummer agreed to bail Mr. Hill out, as the court finally agreed to bail after its ruling, noting that it "had never granted one of these before."  However, the government "repeatedly" called Cynthia Plummer's job [she was a Nassau County Correctional Officer] asking that she be "fired" for what it characterized as "fraternizing with a felon" [they lived

---

[2] Mr. Hill was attending a funeral for Michael Skillings and was in the middle of the funeral procession when attacked by police with guns aimed at him and all occupants of the car, Sarah Gizman and  Pastor Collins.

together].  To save her job, Ms. Plummer subsequently declined to sign for bail and never appeared in court again on Mr. Hill's behalf.  Her next appearance was as a government witness.

Forty days after the court's ruling, the government recharged Mr. Hill with introduction of prison contraband then asked bail be denied on "that" charge, which the Magistrate Judge denied, but the District Judge granted.  This same Judge Hurley had granted the suppression hearing and bond.  The government then asked Judge Hurley to "reconsider" its suppression ruling, citing a 15 page motion the amount of "police shootings" in the line of duty and alleging Mr. Hill "told officers after arrest he would have 'shot them' if not apprehended quickly."[3]  The government also cited upward of 25 cases, none of which consisted of similar facts in Mr. Hill's case.

The court asked Mr. Keating on *two* separate occasions if he would ▶ be responding to the government's brief for reconsideration.  Both times Keating stated he would.  Mr. Hill sought to prepare a response himself, but Keating would not mail him the government brief and the court ordered counsel to file any response.  On a "third" occasion, the court inquired whether Keating would be doing a response.  This time Keating said "no" and would rely on previous arguments presented.  Two weeks later, in a five-page decision, the court reversed itself.  Keating then set a trial date unbeknownst to Mr. Hill and attempted to convince him to "plead guilty and appeal," in his words "this is what's to be done in these situations."

Mr. Hill fired Keating and went *pro se* as he came to realize the "fix" was in.  The court ordered a psychological evaluation despite Mr. Hill's objection.  After the evaluation, the court appointed Maureen Hoeger to review the evaluation content and determine if Mr. Hill would object to its findings, he did not.  Mrs. Hoeger, in a well-written and caring two-page letter,

---

[3] The Government claimed Mr. Hill made this statement, yet there exist not a single written or recorded statement by Mr. Hill.

4

explained to the court why Mr. Hill deemed it imperative to go *pro se* and the issues he wanted to pursue, then requested stand-by counsel be appointed to assist him.  (See Exhibit B)

The only reason Mrs. Hoeger declined to serve in such capacity was because her office was located in Long Island and Mr. Hill was confined to Brooklyn MDC and this would present insurmountable problems for preparing an effective defense at trial or preparing motions

Jerry Tritz was appointed as stand-by counsel who along with a paralegal, two law students, and private investigator, prepared detailed motions related to re-re-consideration of the suppression ruling; Speedy Trial Act violations; exclusion of alleged proffer statements; revealing of the confidential informant's identity; dismissal of the indictment due to Restoration of Civil Rights relevant to 18 U.S.C. 922(g); *inter alia*.

Mr. Hill was transferred repeatedly to MDC, MCC,[4] Passaic County Jail; Suffolk County Jail;[5] Nassau County Jail, Rikers Island; V.C.B.C., USP Lewisburg, Queens Detention Center, all while a pretrial detainee.  At all these institutions Mr. Hill was kept in segregation.

While confined at Brooklyn MDC and still represented by Keating, the government informant, Jerry Russell (aka Poite) alleged (to the government) that Mr. Hill was in possession of prison contraband, namely, an exacto blade, which he claimed Mr. Hill had received from his C.O. girlfriend that visited him at MDC.  The government contacted MDC Staff, a search ensued, no blade was ever recovered, yet Mr. Hill was federally charged and placed in S.H.U., although not found in possession of any contraband and not having been found guilty either institutionally (at a DHO hearing) nor judicially.  Based on the word of informant, Russell, Mr. Hill's visits were restricted and denied to his fiancée, Cynthia Plummer.  Anyone else could visit.  The

---

[4] Mr. Hill was held in a terrorist Unit at MCC. See July 13, 2004 hearing transcript, pages 15-17.

[5] He was drugged in Suffolk County Jail against his will by Suffolk County Jail officials during a Use of Force. (See, EDNY, Docket Number, 02-cv-3901)

government then directed Jerry Russell to obtain any inculpatory statements from Mr. Hill, despite Mr. Hill being represented by counsel.

Since Mr. Hill did not associate with informant Russell, he was unable to get such statements. In substitution, he instead stole various legal documents which outlined the State and Federal charges for which Mr. Hill had been prosecuted. Garland Tyree testified to observing informant Russell on one occasion stealing legal documents out of the cell that he (Tyree) occupied with Mr. Hill. Informant Russell claimed he had conversed with Mr. Hill and learned various facts relevant to his federal prosecution. The government enlisted informant Russell as a "cooperating informant," transferred his case from the Southern to the Eastern District of N.Y., provided a "5K1 letter" on his behalf, and he was set <u>free</u> for his alleged cooperation. Informant Russell testified against Mr. Hill at his trial.[6]

The government then sent Sara Guzman to Passaic County Jail to visit Mr. Hill and (again) attempted to obtain inculpatory statements it could use.

They also sent Daniel Skillings, where the government made <u>several</u> tapes of these conversations – yet did not use any of them at Mr. Hill's trial, as the dialogue was obviously <u>exculpatory</u>.

After said recordings were made at Passaic County Jail, the government (again) superseded Mr. Hill with a new indictment – which in sum, carried a life sentence. After years of filing motions, being continuously transferred from facility to facility, and being confined to segregation for the duration, Mr. Hill, against judicial advice, demanded trial, expeditiously. A February trial date was set which prompted Jerry Tritz (stand-by counsel) request to be relieved as counsel since he had a prior trial engagement for the same date. Mr. Tritz agreed to attempt to

---

[6] Not only was Jerry Russell's case transferred from the Southern District of New York, to the Eastern District of New York, but also at the Government's request was then assigned to Judge Hurley, the same Judge residing over Mr. Hills case. This Judge gave Jerry Russell probation for helping the Government convict Mr. Hill.

find counsel that could "get prepared" and would abide by the strategy and defenses himself and Mr. Hill had crafted against the charges.

Mr. Tritz second choice was Susan G. Kellman, whom Mr. Hill initially objected to because he was aware Ms. Kellman had lost Garland Tyree's case.  But after being introduced, and assurances by Mr. Tritz, Mr. Hill conceded to accept Ms. Kellman contingent upon her "familiarizing herself with the strategy and defenses already formulated, and reading over the suppression hearing testimony, listening to the recordings and subpoenaing essential witnesses," *inter alia*.  None of which she did.

When Ms. Kellman entered the case in late 2004, she was aware that Mr. Hill had a trial date in less than 90 days.  Yet she made no effort to familiarize herself with the case, despite knowing she would be "trying" the case before the jury.  Ms. Kellman never met or interviewed a single witness Mr. Hill proposed and did not utilize the strategy and defense formulated by Mr. Hill and Mr. Tritz, nor did Ms. Kellman create her own defense to any of the charges.

Ms. Kellman never interviewed or had a conversation with Pastor Michael Skilling who had testified at the suppression hearing that he witnessed the search and seizure of Mr. Hill at gunpoint, by Port Washington Police and never observed any firearm removed from his person by said police.  Ms. Kellman never called Pastor Michael Skillings as a witness at Mr. Hill's trial, after mendaciously saying she would, and despite his "willingness" to testify.  (See Affidavit Exhibit "C").

Ms. Kellman never called or interviewed Mrs. Skillings or Pastor Collins who also were witnesses and willing to testify.  (See Exhibit "C").

Ms. Kellman refused to be present during Mr. Hill's interview with Sandra Escalera as a potential witness.  Then, after the decision to call Ms. Escalera as a witness was agreed upon,

unbeknownst to Mr. Hill, Ms. Kellman never returned Ms. Escalera's calls and never called her as a witness despite her willingness to testify to facts related to an agreement between Omar Eusty, Sarah Guzman, and others to implicate Mr. Hill in a robbery conspiracy in exchange for their freedom, and to having been aware of certain events relative to the charged conspiracy. (See Affidavit Exhibit "D").

Knowing that Mr. Hill's fingerprints were <u>not</u> on any of the firearms introduced at trial by the government, Ms. Kellman failed to call a fingerprint expert or the person from the police who had tested said firearms for fingerprints. In fact, she failed to produce any fingerprint evidence, rather the lack thereof, at trial. Such evidence was clearly relevant since Mr. Hill was charged with possession of the .38 caliber at the time of his arrest and which police claimed to have taken off of his person and was alleged to have engaged in a robbery spree utilizing each of the weapons displayed for the jury.

Ms. Kellman failed to ask for the exclusion of Naiomi Eutsy's testimony or request a mistrial once it became apparent that the government had misrepresented what her testimony would be. In that, the government via letter of AUSA Donoghue explicitly told the court that Mr. Hill had "threatened" Ms. Eusty in an attempt to force her to testify favorably for him. Ms. Eusty clearly testified she had never been threatened or coerced by Mr. Hill, so that the justification by the court for allowing her testimony no longer existed. And in fact, had been allowed, it was under false pretense and specious representations by Mr. Donoghue. Moreover, Ms. Kellman failed to question Ms. Eusty about how she knew to contact Donoghue directly. Ms. Eusty's entire testimony should have been stricken from the record and a mistrial requested since the jury had already been allowed to view the questions and answers prepared by Mr. Hill for Ms. Eusty when he was *pro se* and preparing a defense for trial. (Eusty, Tr. Transcript____)

8

Ms. Kellman failed to present any defense for which the jury could use as a basis for a not guilty verdict. For example, when Mr. Hill refused, the government proposed (and Ms. Kellman acquiesced) stipulation that "narcotics" affected interstate commerce *per se*, and it was established by Ms. Kellman via cross examination of DEA agent McDonnell that marijuana and ecstasy could be manufactured within any State of the U.S.A., Ms. Kellman nonetheless failed to argue the "lack of interstate commerce effect," proven by the government with regard to counts two, three, four, five. A nexus that if not proven, is fatal to any (18 U.S.C. 1951) Hobb's Act prosecution. As robbery is a State offense historically, and Congress generally and judicial interpretation in particular has stretched the commerce clause to encompass virtually every State robbery. Yet without a proven effect on interstate commerce *e.g.* that narcotics crossing State or Foreign lines in possession, transportation, or manufacture, *etc.,* the federal courts lack jurisdiction. An argument and defense[7] which clearly had merit with regard to all the marijuana counts, subsequently dismissed via Rule 29 motion, which Ms. Kellman took over a year to file. After Mr. Hill testified the firearm had been planted by the Government's confidential informant, Ms. Kellman still never argued or proposed this defense to the jury or renewed objection and request for production of the C.I. Despite the fact that government witness Naomi Eusty testified that Mr. Hill was not wearing his leather coat while at the funeral home. Providing said "C.I." with opportunity and his motive should have been brought under scrutiny via cross-examination of Police Officer Steadman, or Investigator Whiston should have been called as a defense witness along with subpoenaing the C.I., as was the trial strategy formulated by Mr. Hill and Mr. Tritz. (Mr. Tritz even requested to interview the C.I., but the government refused).

---

[7] (Mr. Hill found the case law for the Rule 29 motion and filed a motion *pro* se, since Ms. Kellman for a year refused to file said motion and only reluctantly did so after "repeated" threats by the court. (See court order Exhibit "E"))

Instead of a defense, during closing arguments, Ms. Kellman told a story by <u>Dr. Seuss</u> relevant to "green eggs and ham," and another perhaps she concocted about a beautiful restaurant that served "mice" as its main course.

> "And I submit to you, members of the jury, that there is a story I used to read my kids, Green Eggs and Ham. Dr. Suess's Green Eggs and Ham. There is a character Sam I Am. And Sam I Am says, you know, I think you should try these green eggs and ham, they are real, real good. You know I really don't like greens eggs and ham. No, you have to try it in the house, try it with a mouse, try it with a fox, try in a box. And you know it goes on and on. In the end Sam tries the green eggs, and Sam doesn't say, hey, these are great, uh-uh. Sam says exactly what [sic] has been told. Sam says, oh, I like them in the house, I like them with a mouse, I like them in a box, I like them with a fox. He says exactly what he has heard."

These stories, while very well told, (possibly from repetition at other defendant's trial) served <u>no</u> legitimate trial related purpose. When a <u>fair minded</u> individual looks at the facts of this case, *e.g.* what the government did not have, not a single robbery victim, no narcotics, no money, no jewelry, no fingerprints on any firearms adding what could have been utilized in Mr. Hill's defense, *e.g.* four favorable witnesses (Pastor Skillings, Mrs. Skillings, Pastor Collins, Sandra Escalera), subpoenaing the C.I. and Investigator Whitson and on and on. In comparison to what the government did produce and the "court" characterizes as an "avalanche" of evidence, word of mouth by cooperating witnesses, Sarah Guzman, Omar Eusty, Daniel Skilling, Jerry Russell, Cynthia Plummer, Naiomi Eusty and various law enforcement personnel, none of the "physical evidence", *e.g.* weapons contained Mr. Hills fingerprints. So again, the evidence consists of word of mouth. Count Three is only alleged to have been witnessed by <u>one</u> person: <u>Sarah Guzman</u>, who has proven herself a pathological liar. No witnesses, only the word of someone who admittedly blamed a firearm on someone named Korleaone,[8] then after being visited by him and engaging in a sexual relationship with him, transferred blame to Mr. Hill, *inter alia*. The same for Count Two the conspiracy; it is only her word that implicates Mr. Hill.

---

[8] Korleaone was the best friend of Omar Eusty.

She is the only one who claims to have had a conversation (conspired) concerning the robbery or narcotics traffickers.   (See Guzman testimony Tr. Trans. 472.)   With regard to the Count III robbery for which Mr. Hill received 20 years, Guzman stated:

> "We went on the block in the car.  Then we seen a few people outside.  We parked the car the next block over, and we got through somehow.  No one was there, so we stayed a few minutes and we started walking away.
>
> A male approached us and asked if a specific person was there.  We said no. That's when Demetrius grabbed him and I went through the pockets.
>
> While doing that, two other males came and approached, and asked for a specific person again, and that's when I had pulled out my gun and went through the pockets as well."

(*Id.* Tr. T. at 345.)[9]

None of the other cooperators testified concerning the factual allegations of Count Three, or any *per se* agreement for Count Two – only Guzman.  So that the truth is, that Mr. Hill has a 20-year sentence based on the word of one testifier.

Had Susan Kellman pointed this imperative fact out to the jury in her closing argument, there is a high probability Mr. Hill would have been found not guilty of those two counts.  Proof lies in the fact the jury initially asked for a "read-back" of Guzman's testimony.   The jury presumably changed its mind after seeing the long, drawn-out process with Cynthia Plummer's testimony.   Had they been pointed to where specifically to look for the factual allegations of Counts Two and Three and been advised that only "Guzman's" word supported those counts, surely the outcome would have been completely different.  Unless the court would believe that, the jury believed Guzman completely, although the court does.  More practical is the proposition that had a "defense" been utilized, instead of two non-sensical irrelevant diatribes about not wanting "green eggs and ham," or being "served mice in restaurants," Mr. Hill would not be

---

[9] Guzman also stated that she says, "what pops into her head." (*See* Tr. T. at 472)

11

convicted of crimes that in all likelihood "popped into (Sarah Guzman's) head." (Trial Trans. 472).

After trial when Mr. Hill was found guilty, the PSR calculated Mr. Hill's sentence at <u>107 years</u> due to mandatory minimums and another <u>10 years</u> on the remaining counts. The government requested a two-point enhancement for "obstructions of justice," bringing Mr. Hill's sentence to <u>120 years</u>. No other objections to the PSR were requested by the government.

However, a Rule 29 motion was granted and <u>eight</u> counts were dismissed by the court on jurisdictional and insufficiency of evidence grounds. So, that without any mandatory minimums, Mr. Hill faced a sentence of ten years or less based on the PSR. The government enraged by the Court's decision, sought to give Mr. Hill as much time as possible. In the furtherance of that objective and without objection form Ms. Kellman, the government filed various, belated objections to the PSR and requested a voluminous amount of new enhancements which the Probation Department did not originally request via proposed addendum(s) to the Court. Mr. Hill proposed sentence was <u>re-calculated</u>, so that he now faced a 50-year sentence based on a judicial "fact finding" of nothing more than "preponderance of the evidence," a vague judicially created standard reached with little to <u>no</u> evidence and virtually <u>always</u> sustained on appeal.

By counsel failing to object to the new enhancements as vindictive and violative of Fed. R. Crim. P. 32(b)(6)(d), the court was obliged to consider said new enhancements <u>and</u> if the court failed to do so, and simply sentenced Mr. Hill in accordance with the original guidelines, the government would have had the ability to mount a meritorious appeal – since all that was needed to impose said enhancements was preponderance of the evidence.

Finally, Ms. Kellman failed to request a single downward departure, despite the applicability of many. As a few examples, numerous prisoners who were confined as pretrial detainees in

Passaic County Jail were given downward departures due to the deplorable conditions of confinement. See USDJ Judge Katherine S. Hayden, *United States v. Sutton*, 07-426 (USDC NJ, 10/25/2007) Moreover, numerous pretrial detainees had received downward departures for being confined in similar conditions in the E.D.N.Y. and S.D.N.Y.

Mr. Hill had been transferred countless times and repeatedly kept in SHU at Suffolk County Jail (where he was forcibly drugged by prison officials, a fact not in dispute), MDC Brooklyn, M.C.C. Manhattan, Passaic County Jail, Nassau County Jail, each over two times. At one time, standby counsel, Jerry Tritz, complained to the court that Mr. Hill was confined to the "Terrorist Unit" (10 South) at M.C.C. Manhattan – the only one in such confinement who was not charged as an alleged terrorist. (Exhibit "F"). Not to mention the voluminous acts of assault and abuse perpetrated by staff in those institutions.[10] All of which Ms. Kellman never investigated or requested a downward departure for, these same conditions when perpetrated against "Jose Padilla" an alleged "enemy combatant," he received a sentence <u>less</u> than Mr. Hill's due to such downward departures.

Ms. Kellman was overheard (in court prior to a sentencing hearing) by Magdalena Sanchez in collusion with A.U.S.A. Donoghue making extremely unprofessional, disrespectful, disparaging comments about Mr. Hill – prior to him being brought into court. (See Nassau County Jail Recording Between Mr. Hill and Magdalena Sanchez) These comments reflected Ms. Kellman's personal feelings toward Mr. Hill and explain <u>why</u> she chose not to mount a viable defense and stayed silent through the inflammatory questions asked over 15 times by the government on cross-examination of Mr. Hill.

---

[10] See *Hill v. Laird*, 06-cv-126 (EDNY) and New York Post Articles where over 10 BOP MDC Officials were arrested and found guilty of violating prisoner's rights in MDC Brooklyn.

When one who is impartial looks at what was available to Ms. Kellman to utilize in defense of the charges against Mr. Hill – yet was not used, it can be fairly stated that Ms. Kellman was intentionally ineffective – and this was not mere negligence, but rather conduct that fell deliberately far below professional norms.

Attorney Robin Smith was appointed to appeal Mr. Hill's conviction and although Mr. Hill had preserved numerous meritorious issues for appeal, Ms. Smith raised issues that clearly lacked all merit. For example, Ms. Smith argued that the government struck 50% of the black jurors from the petit jury using its prempretory strikes, there was only "2" black potential jurors the government struck one. Ms. Smith went on to argue the government struck 33% of the Hispanic/Latino jurors, the government struck one of three potential jurors. As a *Batson* challenge, this issue was beyond ridiculous and lacked all merit.

In a "sufficiency of evidence" claim its axiomatic that a "defendant bears a heavy burden," because the court views "all" trial evidence in the light "most favorable to the government" Yet Ms. Smith saw fit to argue to the Court of Appeals that on the Count Three robbery, the only view of the evidence at trial is that while intending to rob drug dealers, "defendant changed plans and robbed drug buyers." Whether or not there is a constitutional right to appeal is irrelevant. There is a "judicially created right" (see argument and case law *infra*) and Mr. Hill was deprived of that right when counsel chose to be ineffective. Mr. Hill *pro-se* had filed numerous pretrial motions that were denied in the District Court and thereby preserved for appeal. Some of these motions contained issues of first impression in the Second Circuit, had they been filed, and if granted, would have required a new trial or dismissal of the indictment. *E.g.* speedy trial motion, there are clear violations of the STA and all Supreme Court precedent is in Mr. Hill's favor so that had the STA violations been raised, the indictment would have been dismissed.

14

There was a motion to produce the confidential informant, dismissal of 922(g) count due to restoration of civil rights and numerous sentencing issues at a time when the applicability of *Booker/Fanfan* and the sentencing guidelines were being litigated all over the country in every federal court, Ms. Smith raised not one sentencing issue, and Mr. Hill received the statutory maximum on all counts.

## MEMORANDUM AND CITATION OF AUTHORITIES

## I. EVIDENCE OF COUNT THREE IS BASED SOLELY ON GUZMAN'S TESTIMONY AND COUNSEL'S FAILURE TO PRESENT ANY DEFENSE TO COUNT III WAS INEFFECTIVE ASSISTANCE OF COUNSEL

The crux of this point is that Petitioner is actually innocent of this count, a count which only one person says actually occurred – Sarah Guzman.  Guzman, who has been proven to have lied constantly throughout this case, to even admitting that she blamed another individual for her firearm, then after he came to visit her during her incarceration, became her boyfriend, had sex with him, then blamed the firearm on Petitioner.  (Tr. T. at 381, 382)  Although the court (as the Government repeatedly utilizes) believes there was an "avalanche of damaging evidence."  (June 12, 2006, T. Tr. 11).  And that the evidence against Petitioner "from multiple sources independent of Guzman was overwhelming" (March 4, 2010 order at 17-18) does not negate the fact that only Guzman testified to this count and her recital of the events are farfetched to say the least.  This event was concocted and Petitioner should not spend 20 years of his life confined to a prison based on the word of one witness who has been proved to have repeatedly lied.  To save this unjust conviction and protect ineffective counsel, as always the Government mischaracterizes and attempts to re-shape the testimony of Guzman with regard to Count III.  What Guzman specifically states is

15

> "We went on the block in the car. Then we seen a few people outside. We parked the car the next block over, and we got through somehow. No one was there, so we stayed a few minutes and we started walking away.
>
> A male approached us and asked if a specific person was there. We said no. That's when Demetrius grabbed him and I went through the pockets.
>
> While doing that, two other males came and approached, and asked for a specific person again, and that's when I had pulled out my gun and went through the pockets as well."

(*Id.* Tr. T. at 345.)

At no time does Guzman mention any pre-planning for this specific robbery. At no time does Guzman ever state "At the target location [we] encountered <u>three</u> men and robbed them at gun point..." (Govt. Resp. Br. at pg. 20). Guzman clearly stated "no one was at the location when we (allegedly) arrived, and that we turned to leave." That's when "a male approached us and asked if a specific person was there. We said no. That's when Demetrius grabbed him and I went through the pockets." (See 2/8/05 Tr. T. at 345) This testimony would constitute nothing more than a State "attempted robbery and battery." Why - because Guzman never states anything at all was taken from this individual. Moreover, the fact that we were supposedly about to leave the scene negates any prior intent, or at least an abort of any pre plan.

This was obviously a separate and distinct act, an act clearly not charged in the indictment, and having no affect whatever on interstate commerce. This testimony begs the question which offense did the jury base its verdict on, the first individual or the second set of "<u>2 males (that) came and approached and asked for a specific person again and that is when I had pulled out my gun and went through the pockets again.</u>" (*Id.* T. Tr. at 345)

It would be constitutionally impermissible and a miscarriage of justice to simply *"assume"* the jury's verdict rested on the second half of the testimony, and further *"assume"* from where

16

the drugs came from, to maintain Petitioner's liability. Guzman does not state that Petitioner did anything with regard to the second set of alleged victims.

Even if the court disagrees that Kellman should have argued constructive amendment of the indictment, the court must agree that a specific defense should have been presented for this testimony. First, the recital of events by Guzman is bizarre, e.g. why would two people approach a robbery or battery scene asking for a specific person; nonetheless, the first robbery was completed presumably after Guzman went through the pockets, and said victim is no longer mentioned. The Government failed to ask what drugs came from whom, and this is fatal to a robbery that has to have an affect on interstate commerce. Kellman raised no specific defense to this count (or any other count) and even failed to raise this insufficiency claim in the Rule 29 hearing.

Any attorney who cared about being effective would have brought this testimony to the jury's attention especially since Guzman is the <u>only</u> witness to have testified with regard to this count. Guzman repeatedly lied under oath and admitted to saying whatever "popped into her head." (*Id.* T. Tr. at 472)

The government in protecting Kellman, calls Petitioner's argument "frivolous and absurd" (Govt. Br. 22) yet they cannot point to a single argument or defense that counsel raised with regard to this specific count or any count. *Pavel v. Hollins,* 261 F.3d 210, 228 (2nd Cir. 2001) (counsel's failure to prepare defense and call witnesses was prejudicial, especially in light of prosecution's weak case).

In the context of a *Strickland v. Washington,* 466 U.S. 668 (1984) analyses, the court must judge the reasonableness of counsel's conduct on the facts of the particular case. What competent attorney would not have highlighted and challenged Guzman's specific testimony or

17

this count, for a jury ... and put forth a defense, that that testimony does not constitute the offense as charged ... either because there was no affect on interstate commerce, since nothing is said to have been taken from the first alleged victim; and Petitioner is not said to have done anything with regard to the second set of alleged victims.  Proof beyond a reasonable doubt will not allow a jury to speculate as to whom the narcotics was taken from, because said narcotics is what federalizes this offense.

Counsel could even have argued that only marijuana was taken from the first alleged victim and thus there was no impact on interstate commerce.  There are any number of defenses that could have been raised for this count; and for a trial to be constitutionally just, a defense should have been presented, and there is a high probability that Petitioner would have been acquitted of this count, or at the Rule 29 hearing.  *CF. United States v. Chronic*, 466 U.S. 648, 659 (1984) (Prejudice presumed where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing.")  Cross-examination in and of itself, does not make a trial constitutionally sufficient, a lawyer must use what is gained through cross-examination to create a defense and pursue an acquittal.  *United States v. Alferahin,* 433 F.3d 1148, 1162 (9th Cir. 2006) (Counsel's refusal of materiality jury instruction was prejudicial because it "prevented the jury from considering the very theory of the case on which the attorney was relying.").

Counsel established via cross examination of prosecution witness DEA Agent McDonnell that marijuana could be grown anywhere in the country (*Id.* T. Tr. at 671) yet failed to argue the lack of an affect on interstate commerce for count 3, 4, or 5 to the jury, an argument that had a reasonably probability of acquiring an acquittal on which resulted in 8 counts being dismissed via a Rule 29 hearing.  Just because Guzman added crack cocaine, to her story, does not negate this defense, on the contrary even assuming the narcotics came from the second set of alleged

18

victims, even under an aider or abettor theory, Petitioner simply (presumably) being present at the scene would not of rendered him liable.   The point however is that counsel had an obligation to create a defense to the charges for which his whole life was literally on the line, see *Dixon v. Snyder*, 266 F.3d 693, 703-05 (7th Cir. 2001)(Counsel's failure to cross-examine sole eyewitness against defendant was ineffective assistance because witness testimony was only direct evidence against defendant).   Ms. Kellman told several stories during closing argument including one about Dr. Seuss, these stories while well told, did nothing and added nothing to Petitioner's cause of being found not guilty.

> "And I submit to you, members o the jury, that there is a story I used to read my kids, Green Eggs and Ham.  Dr. Suess's Green Eggs and Ham.  There is a character Sam I Am. And Sam I Am says, you know, I think you should try these green eggs and ham, they are real, real good. You know I really don't like greens eggs and ham.  No, you have to try it in the house, try it with a mouse, try it with a fox, try in a box.  And you know it goes on and on. In the end Sam tries the green eggs, and Sam doesn't say, hey, these are great, uh-uh. Sam says exactly what [sic] has been told. Sam says, oh, I like them in the house, I like them with a mouse, I like them in a box, I like them with a fox.  He says exactly what he has heard.

*Id.* (Tr. T. at 1198)

Counsel should be held to have been ineffective for not creating and presenting a defense to count 3, and Petitioner was severely prejudiced as he now has a 20-year sentence and conviction for a crime he did not commit.

## II. GUZMAN FAILED TO STATE "WHERE THE CONSPIRACY, (E.G. THE MEETING OF THE MINDS OCCURRED) AND COUNSEL FAILED TO CHALLENGE THE THREE SEPARATE CONSPIRACIES AT TRIAL WHERE THE INDICTMENT ONLY CHARGES ONE.

The Government claims there was a single conspiracy yet the evidence is clearly to the contrary.  First, as the Government points out, Petitioner was charged for a conspiracy "within the Eastern District of New York <u>and</u> elsewhere" and it says "together with others" did knowingly and intentionally <u>conspire</u> ....

19

The Government cannot use multiple conspiracies as evidence to support an Indictment for a single conspiracy; the evidence at trial may not vary impermissibly form the allegations of the Indictment. *Kotteakos v. United States*, 328 U.S. 750 (1996). A defendant may establish a fatal variance when the evidence at trial establishes facts materially different from those alleged in the Indictment. *U.S. v. Gross*, 329 F.2d 180 (4th Cir. 1964), in *Gross* the Fourth Circuit struck down a conspiracy conviction in a case which the Government had charged ten defendants (though it identified 25 co-conspirators) with "white liquor" violation and alleged a single conspiracy involving multiple conspirators in multiple locations. The Court struck down the conviction because the evidence failed to prove any "unitary scheme" or "common aim," rather it presented a series of undoubtedly criminal activities that had no evidence relation to each other. *Id*. 183-184. *United States v. McLean*, 1998 U.S. App. Lexis 31500 (4th Cir. 1998). The "graveman of the crime of conspiracy is an agreement to effectuate a criminal act." *United States v. Laughman*, 818 F.2d 1067, 1074 (4th Cir. 1980). In *McLean,* the Court reversed the District Court and remanded for entry of a judgment of acquittal, holding that the "prosecution's" evidence showed three separate periods of criminal activity which the prosecution could not string together for common trial when the only nexus among them was that one defendant participated in all.

Petitioner's position is that once the Government brings forth evidence of the "meeting of the minds" to prove its conspiracy as was done in this case, the Government must prove that said meeting took place on a proper <u>venue</u> and <u>jurisdiction</u>, *i.e.* the <u>Eastern District of New York and elsewhere.</u> The Government's whole theory for count two, was that Petitioner initiated a plan of robbing drug dealers with Guzman and that he and Guzman both made an agreement to perpetrate said robberies. (See T. Tr. at 335). The Government solicited this (alleged) agreement and meeting of the minds. *Id.* The Government even sought to sustain the conviction

based on this theory of an agreement to conspire. (See Feb. 27, 2006 hearing Tr. at 52, 53.) "It was Mr. Hill's idea to rob drug dealers, an inherently dangerous undertaking."

And during summation, the Government told the jury "What did [Guzman] say happened? ... After a few weeks the defendant says, hey, why don't we start robbing drug dealers..."

Clearly, the foundation for the conspiracy count is the (alleged) discussion and agreement to commit robberies. That being the theory elicited and relied upon by the Government, they have a corresponding obligation to prove said conspiracy of agreement took place "within the Eastern District of New York and elsewhere." *Fiore v. White,* 531 U.S. 225, 228-29 (2001)("due process violated when defendant convicted for operating facility without permit because prosecution failed to show defendant did not possess hazardous waste permit.") The Government can find nowhere in the entire transcript where Guzman states the location of this conspiracy, *i.e.* meeting of the minds, because he failed to ask where the alleged conspiratorial conversation and agreement took place. See, *United States v. McGuire,* 178 F.3d 203, 205-11 (3d Cir. 1999) (prosecution's failure to prove jurisdictional element beyond reasonable doubt required reversal of conviction for aiding and abetting use of explosive to destroy property affecting interstate commerce"). *United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006)(prosecution's failure to prove beyond reasonable doubt that defendant had intent to harm required reversal of mail fraud conviction). Without proof that said agreement and conspiracy was consummated "within the eastern district of New York and elsewhere" the Government has failed to prove each element charged in the indictment. This should have been raised by trial counsel and briefed an appeal as it could have produced an acquittal or reversal on appeal.

As set forth more fully in the principle brief, three conspiracies are covered during the trial at three different time sand amongst three different sets of people e.g. (allegedly) Petitioner and

21

Guzman; Mike Skillings and Daniel Skillings; Mike Skillings and Omar Eusty. (T. Tr. Feb. 8, 2005 at 499 and 508) (T. Tr. Feb. 9, 2005 at 728)  There are 3 separate agreements, which one did the jury convict Petitioner of, the allegations in the indictment "together with others" yet there exists no evidence in this record that there was agreement between Petitioner and any other coconspirator besides Guzman.  The Government (Br. pg. 31) states "and evidence in the case clearly established that there was a single conspiracy between Guzman and Hill" that's not the issue … the issue is there's no evidence of where the conspiracy was made at and which conspiracy did the jury convict of since three are discussed in the record, at different locations, and during different months, and amongst different individuals.

## III. FAILURE BY COUNSEL TO USE THE PASSAIC COUNTY JAIL RECORDING WHICH CONTAINED AN EXCULPATORY CONVERSATION BETWEEN PETITIONER AND THE GOVERNMENT'S STAR WITNESS WAS INEFFECTIVE ASSISTANCE.

As stated in the principle Title 28 U.S.C. 2255 brief, Ms. Kellman was aware and in possession of crucial evidence that could have lead to an acquittal and failed to utilize it after stating that she would.  The Government can continue to say what it will, yet the significance of Passaic County Jail recording lies in the fact that Government never sought to introduce said recordings at trial.

The Government can continue to paraphrase excerpts from the conversation yet Sarah Guzman never implicates or indicates that Petitioner was doing any robberies with or without her or anyone else.  And denies her own involvement as well, the entire context of the conversation is exculpatory.  And if … the recording was "highly incriminatory," The government would have utilized said recording – to be certain. (Govt. Response Br. at 26)  That was their purpose in making such recordings and sending Guzman to the jail to visit Petitioner.  The fact that the Government now calls a recording that it did not use "highly incriminatory" is ridiculous, what is

22

pertinent is that the jury would have had an opportunity to listen to a live interaction and conversation between Guzman and Petitioner. A conversation in which Guzman never once implicates Petitioner in any robbery scheme. And the clear argument, for the jury that Petitioner had no way of knowing he was being "recorded by Government agents." Guzman, who presumptively did know, never directly, indirectly, or inadvertently indicated Petitioner was doing any robberies – throughout an hour of conversation.

In fact, the relevant parts of the tape provides that Guzman was coerced into providing testimony:

Guzman:      "So... les say that does happen and they ask you and you say yeah?

Petitioner:   "I don't understand"

Guzman:      Let's say the Judge does ask you where you threatened or bribed to *testify* ... against ('you') and the person says yes.

*Id.* (Audio Tapes Passaic County Jail Recording)

This recording, clearly establishes that Guzman was advising Petitioner that she had been "threatened" to testify against Petitioner during the trial. This statement was crucial to discredit Guzman's trial testimony.

AUSA Donoghue is not in the pursuit of justice in this case and his inappropriate unprofessional characterization of Petitioner as "an angry, manipulative, street-smart violent felon" (Govt. Resp, Br. at 26) and clearly displays his personal vendetta, vindictiveness and fatuous mentality from the inception of this prosecution. The fact that Ms. Kellman is working in collusion with the AUSA and fabricating her affidavit speaks volumes – Ms. Kellman never told Petitioner nor consulted him about not utilizing the Passaic County Jail recording or not calling Pastor Skilling to testify – Petitioner would have never agreed to this. See, Ex. I Kellman letter

23

There was nothing strategic about Ms. Kellman not using the Passaic County Jail recordings in light of the Government's evidence and the fact that the only defense witness she called was Garland Tyree whom she instructed not to testify for Petitioner and Petitioner who she object to testifying in his own behalf. Ms. Kellman other than disjointed cross-examination left the Government's case virtually unchallenged *Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001) and there was available evidence from numerous sources. Counsel was ineffective for not using the Passaic County jail recordings, *Towns v. Smith*, 395 F.3d 251, 258-60 (6th Cir. 2005) (counsel's failure to conduct reasonable investigation into "known and potentially important alibi witness" was prejudicial because investigation would have produced reasonable probability of defendant's acquittal.).

## IV. COUNSEL'S FAILURE TO CALL PASTOR SKILLINGS AT TRIAL WHO WAS A CREDIBLE WITNESS CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL

First Ms. Kellman has never interviewed or met Pastor Skillings at any time while she was Petitioner's attorney, or any other time for that matter. And her "decision" not to call Pastor Skillings as a witness was not apart of any strategy and this has only been claimed to avoid a judicial determination that she was ineffective. Ms. Kellman does not state when she allegedly traveled to New Jersey for any such interview with Pastor Skillings, and at no time did she bill the court for such travel expenses as evidenced by her vouchers nor does Pastor Skilling ever claim to have met or been interviewed by Ms. Kellman. Her affidavit is a complete fabrication. Counsel did not represent Petitioner until trial, thus could not overrule Petitioner's right to call Pastor Skillings and failed to state when she spoke to Pastor Skillings. In fact, her affidavit is conflictive of Investigator Rodney Jones affidavit on the same issue. (See, Exhibit **G**)

Moreover, this is a case in which there is no independent evidence corroborating that any of

24

the charged robberies in fact occurred other than the word of co-conspirator with motives to lie, Police officers who have a vested interest in convictions, yet no victims ever came forward and accused Petitioner and the three known victims of Michael Skillings stated Petitioner took no part in said robberies.

*Three* witnesses were willing to testify that Petitioner never was arrested with the charged firearm, an arrest they witnessed firsthand. Pastor Skillings testified unequivocally that he <u>never</u> observed police remove a firearm – period. Pastor Skillings' testimony would have completely contradicted and caused doubt on police officer Steadman's testimony.

Further, as the Affidavit of Rodney Jones indicates (See Exhibit **G**) all <u>three</u> witnesses were willing to testify on Petitioner's behalf. Not to call these witnesses was ineffective assistance of counsel. See *Eze v. Senkowski*, 321 F.3d 110 (2nd Cir. 2003), *Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001). This is a case where the only direct evidence of these crimes is co-conspirator statements.

Further, Ms. Kellman's assertions in her Affidavit are specious and constitute fraud on the Court, e.g., Petitioner was <u>pro se</u> prior to trial and as stand by counsel she had "no" authority to forego Petitioner's Constitutional Right to choose and call witnesses on his own behalf; that would violate Petitioner's Fifth Amendment Rights. Second, her Affidavit is contradicted by (Exhibit H) which are "three subpoenas issued for Michael Z. Skillings, Ada P. Skillings and Calvin Collins." Counsel simply failed to serve the subpoenas on the witnesses. In <u>Exhibit</u> **G** Kellman, in a letter to Petitioner, states she is calling the above witnesses and has investigator Rodney Jones getting in touch with them. Clearly, Ms. Kellman wrote that Affidavit without knowing about Rodney Jones' Affidavit, which is notarized by previous stand-by counsel, Jerry

Tritz, and not knowing Petitioner, had copies of the subpoenas "so ordered" by the Court...
These things belied Kellman's claims of not calling said witnesses, and prove them untruthful.

## V. COUNSEL HAD AN OBLIGATION TO RENEW PETITIONER'S MOTION FOR DISCLOSURE OF THE CONFIDENTIAL INFORMANT.

This entire case in based on word of mouth; when initially charged with 18 U.S.C. 922(g), it was based on the word of a (confidential informant) C.I. who the Government had in hiding. Said informant claimed to know that Petitioner (allegedly) was in possession of a firearm, yet provided no basis of knowledge for this information. The C.I. never knew Petitioner's name, never claimed to have had a conversation with petitioner nor did he state he had any form of relationship, friendship, or acquaintance with Petitioner. Yet supposedly knew of his possession of a firearm within his coat.

Petitioner contended that he was not wearing his coat at the funeral home and this was confirmed by Naiomi Eutsey, see, T. Tr. 681, who testified as a Government witness. She also stated that she did not remember if he was wearing his coat when he left the funeral. *id.* This coincided with Petitioner's testimony that he had hung his coat up in the funeral home, and that whoever called the police and stated that Petitioner had a gun, had in fact planted it in that coat. This was Petitioner's whole defense to this charge and because the only person who could disprove this contention was the C.I., counsel had an obligation to renew the motion (and object) for disclosure of the C.I. Petitioner had a constitutional right to confront his accusers. And counsel knew Petitioner had filed a motion to disclose who the confidential was so he could call him at trial as a witness.

Counsel understood that Petitioner's sole purpose in testifying was to advance this defense yet she never renewed the request to disclose the C.I. If the jury believed Petitioner's testimony and had disbelieved the C.I. who had motive an opportunity to plant the firearm, with the correct

26

tailored jury instruction Petitioner had a high probability of being found not guilty. *Older v. Kentucky*, 488 U.S. 227 (1988); *David v. Alabama*, 415 U.S. 308 (1974); *United States v. Vega-Molina*, 407 F.3d 511, 523-24 (1st Cir. 2005)(confrontation clause violated because district court's refusal to allow defendant to cross-examine coconspirator about possibility of frame-up prevented defendant from presenting a defense); *United States v. Pritchett*, 699 F.2d 317, 321 (6th Cir. 1983)(confrontation clause violated by limiting cross-examination about source of drugs because line of questioning was likely to affect jury's acceptance of defense theory).

Under the "confrontation clause," Petitioner had a right to have the C.I. subpoenaed, as the C.I. was an adverse witness whose testimony was crucial to Petitioner's defense. Moreover, the C.I.'s testimony would have been material to Petitioner's defense and favorable, as it would have proved the C.I. planted the firearm on Petitioner. *Christie v. Hollins*, 409 F.3d 120 (2d Cir. 2005). Counsel had an obligation after Petitioner's testimony to renew the motion for disclosure of the C.I. and to attempt to subpoena said C.I. That is why Petitioner took the stand to lay the groundwork for a defense that Petitioner was framed and the gun was planed in his coat.

## VI. COUNSEL WAS INEFFECTIVE FOR NOT REQUESTING A JURY INSTRUCTION TAILORED TO THE DEFENSE AT TRIAL

At trial, Hills defense to count 1, the 922(g) charge, was that the informant who contacted police allegedly saying that someone fitting petitioner description was in possession of a weapon, had actually planted said weapon on Petitioner. At trial Hill stated:

> "Okay. What happened was and I've told this to the police numerous times, whoever told you that the gun was in that pocket put it there, when I hung my coat up in the funeral home someone knew what they were doing."

(*Id.* T. Tr. 1090)

Petitioner makes clear he was not wearing his coat at the time of arrest. (*Id.* T. Tr. 955, 956, 957) Petitioner states that he had "taken off" his jacket and hung it up in the funeral home. (*Id.* T.

Tr. 965, 966) Naiomi Eutsey who testified for the Government states that petitioner was not wearing his coat at the funeral home. (*Id.* T. Tr. 681)

Pastor Michael Skilling, Sr. testified that he observed police officers frisk petitioner, and never seen them seize a weapon from him. (*Id.* T. Tr. 3-13. Jan. 24 2003) Because petitioner never contested whether there was a firearm found in his coat, and instead testified the weapon had been planted by the C.I. who had motive and opportunity.

Ms. Kellman should have requested a temporary innocent possession jury instruction; or an unknowing non-intentional possession, or simply proposed a jury instruction tailored to the evidence and defense being proffered at trial. *United States v. Alferahin,* 433 F.3d 1148, 1162 (9th Cir. 2006)(counsel refusal of materiality jury instruction was prejudicial because it "prevented the jury from considering the very theory of the case on which the attorney was relying.") Otherwise, what was the sense in eliciting the testimony above if it was not going to be utilized to obtain an acquittal to the charged offense. Counsel presented no theory of which the jury could have made a finding of not guilty on any count and thus was ineffective.

The court telling the jury in its general instruction that in order to find petitioner guilty, they must find he "possessed the firearm purposefully and voluntarily and not by accident" (T. Tr. 1255), has no real relevance if an "unknowing non-intentional possession justification" is not presented by counsel as a <u>defense</u> to said charge. As the Government states, the jury "obviously, and with good reason, they did not believe that testimony." The testimony (Petitioner's) was never presented to the jury as a theory or defense to the charge. Had counsel fleshed out this theory and pointed out that this case originated from a C.I. who claimed Petitioner was in possession of a gun, and who had provided no basis of knowledge as to how he knew of said weapon possession, and who Petitioner testified had planted the firearm, the jury may have

28

believed Petitioner's testimony, or at least a reasonable doubt would have been created. Cynthia

Plummer's testimony would have had no bearing since she claimed to have seen the firearm "the

day he was going to the funeral" yet made clear when asked.

> "But you are not certain weather that's the gun that Mike Skillings had in the hotel room in New Jersey, correct?"

> She responded, "No, I'm not."

(*Id.* T. Tr. 301-19, 526-67)

So there would have been credible argument that the gun was not the same. At the end of

the day, the point is counsel had and presented no defense and never once asked the jury to find

petitioner not guilty – that was ineffective – based on a defense.

And the Government knows said affidavit is a fabrication, concocted to sustain this

conviction.  Moreover, Petitioner never knew that Ms. Kellman had not subpoenaed Pastor

Skilling until the middle of trial, when the court refused to allow Bernard Freeman to testify due

to counsel's mischaracterization of what his testimony would be.

## VII. ASKING PETITIONER OVER 15 TIMES DID EACH WITNESS LIE, VIOLATED CLEARLY ESTABLISHED PRECEDENT.  COUNSEL WAS INEFFECTIVE FOR NOT OBJECTING AND PETITIONER WAS CLEARLY PREJUDICED

A.U.S.A. Donoghue's comments were particularly egregious and improper.  During closing

argument, the prosecutor called Petitioner a "damn liar."  Throughout the trial he repeatedly

asked Petitioner over and over was 13 different Government witnesses lying to antagonize

Petitioner, all while trial counsel sat idly by uttering not a single objection. See *Strickland v.*

*Washington*, 466 U.S. 668 (1984).  Ineffective assistance of counsel merely requires Petitioner to

prove two components:  error and or deficient performance by trial counsel and prejudice from

counsel's errors or deficient performance.  *Id.* at 687.  The District Court has already found error

in counsel's failure to object, and plain error with regard to the particular questions asked by the A.U.S.A. (see *supra* Feb. 27, 2006 Tr. pg. 76).

Because Petitioner challenges the conviction itself, and the Court has already found error, the analysis must center around the effect of such ineffectiveness in the context of the other errors alleged and the overall effect on the trial.  In that, failing to object to the A.U.S.A.'s questions should be weighed, with counsel's failure to utilize the Passaic County recording of November 2004, not calling any witnesses, who were willing to testify, e.g. Pastor Skillings, Ada P. Skillings, Pastor Collins and Sandra Escalera; and failing to utilize Pastor Skillings' suppression hearing testimony, not pointing the jury's attention to specific incredible testimony of Guzman as it relates to Count 3, inter alia.

When counsel's failure to object is viewed in this context, with these surrounding facts, the failure to object is devastating.  For it appears Petitioner has no factual support for his own testimony and his assertions of innocence appear deceptive, when the Government has presented over eight witnesses.  See, *Hodge v. Harley*, 426 F.3d 368 (6th Cir. 2005) (unfortunately when a prosecutor does act unfairly, there is little a defendant can do other than rely on his or her attorney to lodge an appropriate and timely objection.  A failure to make such an objection can have devastating consequences for an individual defendant.  Accordingly, we have previously held that a failure to object to prosecutorial misconduct can amount to ineffective assistance of counsel.  See, e.g. *Gravley v. Mills*, 87 F.3d 779, 785-86 (6th Cir. 1996).  And it must be noted that counsel did not object as Mr. Donoghue made himself a "de facto" witness against plaintiff, e.g. "you told me and…" Tr. Trans. 1030, line 25, and again at Tr. Trans. 1031, line 5 and line 18 thereby informing the jury he was there and that Petitioner was in fact calling him a liar as well, this was extremely prejudicial e.g. what other answer could Petitioner give when asked if

"all" the Government witnesses were lying?...And when an Assistant U.S. Attorney says in front

of a jury "When we met in that room on September 18, 2002, didn't you admit that you

possessed this firearm?..." *id.* He is acting as a witness against the Petitioner in front of the jury,

so that in order for the jury to believe Petitioner, the jury would have to call the A.U.S.A. a liar.

*Hodge v. Hurley*, 426 F.3d 363 (6th Cir. 2005).

The government conferred upon himself the aura of "special reliability and trustworthiness"

by the manner in which these questions are phrased e.g. "you told me" *supra id.* and "when we

met in that room" *supra*. The A.U.S.A. clearly imputed factual matters.

From first-hand knowledge that provided him unwarranted credibility, that could not be

challenged because the A.U.S.A. was not testifying. *C.F. Berger v. U.S.*, 295 U.S. 79, 88 (1935)

("consequently, improper suggestions, insinuations and especially assertions of personal

knowledge are apt to carry much weight against the accused when they should properly carry

none?); *Bates v Bell*, 402 F.3d 635, 646 (6th Cir. 2005) (prosecutors...cannot put for their

opinions s to credibility of a witness, guilt of a def..."); in *U.S. v. Young*, 470 U.S.1, 17, 19

(1985) as the Sup. Ct. stated two separate harms arise from such prosecutorial misconduct e.g.:

> "Such comments can convey the impression that evidence not presented to the jury, but
> known to the prosecutor, supports the charges against the defendant, and can thus jeopardize
> the defendant's right to be tried solely on the basis of the evidence presented to the jury." *Id.*
> at 18 and "the prosecutor's opinion carries with it the imprimatur of the government and
> may induce the jury to trust the government's judgment rather that its own view of the
> evidence." *Id.* at 18-19.

*Burns v. Gammon*, 260 F.3d 892, 897 (8th Cir. 2001) (Counsel's failure to object to

prosecution's statement in closing argument that defendant had forced victim to attend trial

constituted ineffective assistance because reasonable counsel would have objected to such

flagrant violation of defendant's Constitutional Rights.") *Everett v. Beard*, 290 F.3d 500, 515-16

(3d Cir. 2002) (Counsel's failure to object), *Gray v. Lynn*, 6 F.3d 265, 269-70 (5th Cir. 1993) (Counsel's failure to objection).

In context, the government repeatedly antagonized petitioner and goaded him in front of the jury asking him repeatedly if each witness was lying. The court already found plain error. (*See* February 27, 2006, Tr. page 76). And even Mrs. Kellman noticed, "the government really makes attempts to make a fool on the defendant in a completely inappropriate fashion." *Id.* And if the court thinks back to the trial date, it will recall petitioner was even admonished harshly by the court for his agitated response to those questions. Counsel Kellman did not object one time, and the lack of an objection diminished petitioner's possibility of reversal on direct appeal. Had counsel objected even if only once, and the AUSA had persisted, petitioner would at least certainly have been able to raise the issue on appeal and obtain the reversal. See *United States v. Chavez*, 193 F.3d 175 (5th Cir. 1999); *Burn v. Gammon*, 260 F.3d 892 (8th Cir. 2001)(finding ineffective assistance of counsel because counsel's failure to object constituted a deficient performance which prejudiced him because of result of trial or on appeal likely would have been different). It's unfathomable that any competent attorney would have allowed these "rapid fire" questions to persist over 15 times and not object even if only once.

This error caused prejudice as noted by Kellman, *i.e.,* the government attempts to "make a fool" of petitioner and caused him to lash out and answer the questions in a sarcastic and belligerent manner causing the court to admonish petitioner in front of the jury.

At one point, the court directed the jury:

"...that when he makes these questions back it's not a responsive. Just ignore those. Just listen to the questions and answers not the questions that emanate from the witness chair."
*Id.* (T. Tr. at 1031)

32

The cold transcript does not reflect that this was an extremely heated exchange and not once did the court or petitioner's "advocate" prevent or object to the government in sum antagonizing petitioner on the witness stand and for the court to tell the jury to "ignore" certain answers as "not responsive" severely discredited petitioner.

## VIII. COUNSEL RENDERED INEFFECTIVE ASSISTANCE FOR HER FAILURE TO ASK THAT ALL ALLEGED POST ARREST STATEMENTS BE SUPPRESSED

First, the court should note that Ms. Kellman does not dispute that Petitioner in fact requested that she make a motion to suppress all alleged post arrest statements because defendant had told Port Washington Police he was represented by counsel and that he wanted to contact his attorney. Just as Petitioner instructed she file the motion to suppress any and all evidence allegedly found in the Red Jeep Blazer which she did, Ms. Kellman refused stating it wouldn't matter since Petitioner said he made no statements whatsoever.

This advice was wrong and extremely prejudicial because once Petitioner decided to take the stand and testify the door was automatically opened for him to be questioned about statements that numerous law enforcement officers had concocted to obtain this conviction. Had said statements been successfully challenged via motion to suppress, all these prejudicial statements (alleged) would not have been able to be used unless Petitioner had opened the door himself. And to keep said door closed, Petitioner may not have felt compelled to testify.

The Government is correct in saying Petitioner "left no stone unturned in his own defense." So it is practical and rational that he told counsel to move to suppress said alleged statements keeping in mind that he directed she do the same with the alleged proffer.

The only reason Petitioner does not address this when testifying is because counsel stated the court would, on motion of the Government, in its jury instruction tell the jury that the issue of

Miranda and demand for counsel had not resulted in a motion by Petitioner to suppress said statements – thereby doing more harm than good.

There is no question that Petitioner was represented by counsel at the time of his arrest and trial.

## IX. THE GOVERNMENT'S VINDICTIVENESS IN PETITIONER'S PSR AND SENTENCING IS CLEARLY ESTABLISHED IN COUNSEL'S INEFFECTIVE FOR NOT RAISING SAID ISSUE WITH THE COURT

If the government's response is accepted (Govt. Resp. at 35), it will render the U.S. Court of Appeals dictates meaningless, *e.g.*:

> "A criminal defendant must have the right to contest the recommendations of the PSI report agreed to by the government without the fear that, if he or she has success, the government will respond with a new position with regard to the guideline calculations and be able to force the courts to entertain new arguments."

*Id. Johnson*, 221 F.3d 83 at 96 (2nd Cir. 2000).

What the government did in this case, directing the addition of numerous new enhancements as to Petitioner's success on the Rule 29 motion completely contradicts the principles established in the *Johnson* decision and created the appearance of vindictiveness. Vindictiveness must play no part in the prosecutorial or sentencing decision and since the propriety of such vindictiveness may unconstitutionally deter defendant's exercise of his rights, the appearance of vindictiveness must be avoided. See *United States v. Johnson*, 1 F.3d 139, 140 (2nd Cir. 1999); *United States v. Pearce*, 395 U.S. 711 (1969).

In *Johnson*, his attorneys immediately challenged the new enhancements for what they were and no competent attorney, whose client just had "eight" counts dismissed (adding up to over 100 years) would allow the AUSA to add new enhancements based on uncharged robberies so that the sentence is recalculated up to 50 years, and do nothing ... as the government states "The court's decision in the Rule 29 motion dramatically changed Hill's sentencing posture. With a

34

statutory mandatory minimum sentence of 107 years, the particular application of certain enhancements in the sentencing guidelines calculations was largely, if not, completely irrelevant to a sentence that will be imposed on Hill." (Govt. Resp. Br. at 36).

If that were true, why did the government ask for a two point enhancement for obstruction of justice in the original PSR and since the enhancement was requested, why wasn't the other (so called) enhancements given "greater scrutiny" and proposed as well … The AUSA admits that only after the success of the Rule 29, that the request for new enhancements applied. Absent that success, he would not have proposed such enhancements. That is clearly the vindictiveness on the government's behalf.

Counsel had an obligation to challenge these enhancements as vindictive, for at a minimum, the appearance of vindictiveness is clear. Counsel knew that the enhancements being proposed were extremely prejudicial regardless that the sentencing guidelines were advisory only. Because once the new PSR and proposed enhancements were not objected to or challenged, the court became obligated to consider them. Thus, creating the strategic position for the government that if the court refused to apply said enhancement, the government could then appeal that denial and still have the petitioner's sentence enhanced at the appeal.

Moreover, the standard to apply the enhancements (was incorrect to a degree) was "a preponderance of the evidence" a threshold reached with very little evidence. The government did not even have to "prove" that petitioner "knew" of Guzman's age in order to make the enhancement applicable. Counsel, in order to be effective, should have objected to the addition of any new enhancements. Had counsel done this, the court would have had the authority to fashion the sentence truly reflective of the charges of conviction. As it is, petitioner, after the

Rule 29 motion, went from facing eight or nine years incarceration to facing triple what the cooperating co-defendants received. However, Petitioner received a two-decade sentence.

With the new enhancements added, had the court given Petitioner 8 or 9 years, it would have "appeared" that the court provided an extraordinary downward departure due to the new enhancements, when in fact based on the original PSR; this was petitioner's guideline range all along.

Had counsel objected to the addition, after a year of a new enhancement via Fed. R. Crim. P. 32(b)(6)(D) which allows objections to the PSR at any time for good cause shown, there is a reasonable probability that the court would not have sentenced petitioner so severely. Since a petitioner's success on a motion cannot provide "good cause" to attempt to get him as much jail time as possible without being vindictive, counsel should have objected to, and petitioner was severely prejudiced as he was sentenced to 20 year sentence which is double what he faced based on the original PSR.

## X. COUNSEL RENDERED INEFFECTIVE ASSISTANCE WHEN SHE FAILED TO REQUEST A DOWNWARD SENTENCING VARIANCE BECAUSE OF PETITIONER'S EXTREME CONDITIONS OF CONFINEMENT.

When considering this issue, the court should take note that attorney Jerry Tritz addressed numerous conditions of confinement that he himself knew were excessive e.g. he told the Court that while in M.C.C., Petitioner was being held in the facilities "Terrorist Unit"... (Ex. July 13, 2004 - Trans. at 15-17)

> Mr. Tritz: "Let me say this judge. In the months that I've known Mr. Hill, when I first went to set him at MDC, it was a bit of a circus. They would drag him out shackled to bring 30 yards. They would drag him out shackled, hands and feet, waist chains on video cameras held up to videotape, the transition of the 30 yards to a glass enclosed room where I would meet with him. ... He lives in a cage. He has not had family visits for more than a year. He has not had family telephone calls for the same period of time. And, yet, he has concentrated on his material. ... He got moved out of the 10th floor where they keep the trade center bomber type people..."

*Id.* (Ex. July 13, 2004 - Trans. at 15-17)

In this particular unit, there was no human contact, the windows were blocked preventing sunlight from entering the cell, and as Mr. Tritz noted, Petitioner was the only pretrial detainee not an alleged terrorist kept in this unit. Petitioner was also confined in the Terrorist Unit of M.D.C. There is "no" justification for these conditions, and they were not done to Petitioner because of misbehavior. They were done in retaliation for Petitioner's repeated filing complaints and litigation.

In fact, each time Petitioner would file complaints against abusive staff for derelict administrators, he would be moved to another institution. Petitioner was moved from institution to new institution over and over – and this can be proved and verified. But not only that, while a pretrial detainee, Petitioner was repeatedly subjected to excessive force by correctional staff, e.g. see, *Hill v. Tisch*, 02-CV-3901 [E.D.N.Y.]; *Hill v. Laird*, 06-CV-1029 [E.D.N.Y.] and the allegations alleged therein are not in dispute. In *Tisch, supra,* Petitioner was sadistically assaulted and forcibly drugged against his will. Medical records prove this true. Petitioner was beaten so savagely that a judge directed he receive immediate medical attention the following day. In *Laird, supra,* Petitioner was subjected to numerous abuses and excessive force by correctional officials.

In fact, the U.S. Attorney's office [E.D.N.Y.] refused to represent one lieutenant in that litigation because their office had prosecuted said lieutenant for similar abuses and attacks on prisoners at the M.D.C. (Exhibit "J"). Moreover, the same staff who fabricated numerous acts of "alleged misconduct" by Petitioner were later prosecuted by the U.S. Attorney's Office for the Eastern District of New York. Every time Petitioner would file a complaint against staff, he would be transferred shortly thereafter. Petitioner was kept in 23-hour lockdown virtually his

entire pretrial detention. Even when given the court-ordered forensic psychological evaluation, Petitioner was diagnosed as suffering from "major depressive disorder (recurrent)." It was noted that plaintiff was extremely stressed due to his conditions of confinement e.g. 23 lockdown. Throughout the evaluation period, he was kept under this status as well.

According to the Sentencing Guideline Manual, a sentencing court may depart if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." U.S.S.G. § 5K2.0 (quoting 18 U.S.C. 3553 (b)). No evidence exists to show that the Sentencing Commission took the conditions of a pre-sentence detainee's confinement into account in creating the Guidelines. Indeed, there is no indication that the Commission contemplated that federal pre-sentence detainees would be kept in any detention facilities other than federal facilities. See *United States v. Francis*, 129 F. Supp. 2d 612, 616 (S.D.N.Y. 2001). See, *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001)) Accordingly, we hold today that pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures.); *United States v. Francis*, 129 F. Supp. 2d 612 (S.D.N.Y. 2001)(Although departures based on conditions of confinement are not encouraged by the United States Sentencing Guidelines, they also are not discouraged; in fact, conditions of confinement is an unmentioned factor. Therefore, conditions of confinement below those in federal institutions provide grounds for a departure under U.S. Sentencing Guidelines Manual § 5K2.0.)

The harsh conditions of pre-trial detention in the "Terrorist Unit" is considered "harsh" and "punitive in character." See, *Melendez-Carrion*, 790 F.2d at 1008 (Feinberg, C.J., concurring) valid pretrial detention does assume a punitive character, and thus offends the due process clause, when it is significantly prolonged. Such incarceration is "rendered so harsh by its length that

38

it . . . degenerates into punishment." *See also, United States v. Gonzales Claudio*, 806 F.2d 334 (2d Cir. 1986); *United States v. Salerno*, 794 F.2d 64, 78 (2d Cir.) (Feinberg, C.J., dissenting), *cert. granted*, 479 U.S. 929, 107 S. Ct. 397, 93 L. Ed. 2d 351, 55 U.S.L.W. 3315 (1986); *United States v. Theron*, 782 F.2d 1510, 1516 (10th Cir. 1986); *United States v. Colombo*, 616 F. Supp. 780, 786 (E.D.N.Y.), *rev'd on other grounds*, 777 F.2d 96 (2d Cir. 1985).

Every court that has addressed the matter has decided that, despite Congress' silence on the issue in the Bail Reform Act, due process could be violated by reason of a prolonged extension of pretrial incarceration. *United States v. Zannino*, 798 F.2d 544, 548 (1st Cir. 1986); *United States v. Perry*, 788 F.2d 100, 118 (3d Cir.), *cert. denied*, 479 U.S. 864, 107 S. Ct. 218, 93 L. Ed. 2d 146 (1986); *United States v. Accetturo*, 783 F.2d 382, 387-88 (3d Cir. 1986); *United States v. Theron*, 782 F.2d 1510, 1516 (10th Cir. 1986); *United States v. Portes*, 786 F.2d 758, 768 (7th Cir. 1985); *United States v. LoFranco*, 620 F. Supp. 1324, 1325 (N.D.N.Y. 1985), *app. dism'd*, 783 F.2d 38 (2d Cir. 1986); *United States v. Hall*, 651 F. Supp. 13 (N.D.N.Y. 1985); *United States v. Hazzard*, 598 F. Supp. 1442, 1451 n.5 (N.D. Ill. 1984).

As such, this Court must agree that the extended stay in the Terrorist Unit of MCC New York were grounds sufficient within itself to warrant the request for a downward variance in the determined guideline range.

## XI. COUNSEL RENDERED INEFFECFTIVE ASSISTANCE FOR FAILURE TO ADVISE THE COURT THAT IT CANNOT IMPOSE A SENTENCE IN ORDER TO ALLOW PETITITONER TO "REHABILITATE" WHILE INCARCERATED AND APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO ADDRESS THE MATTER ON DIRECT APPEAL

In the instant matter, the Court sentenced Petitioner with the objective that he receives "rehabilitation" while incarcerated.  Counsel had an obligation to advise the court that it cannot sentence Petitioner to an extended term of incarceration in order to promote "rehabilitation."

Under the Sentencing Reform Act of 1984, 98 Stat. 198, a judge sentencing a federal offender must impose at least one of the following sanctions: imprisonment (often followed by supervised release), probation, or a fine. 18 U.S.C.S. § 3551(b). In determining the appropriate sentence from among these options, 18 U.S.C.S. § 3553(a)(2) requires the judge to consider specified factors, including the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (B) to afford adequate deterrence to criminal conduct, (C) to protect the public from further crimes of the defendant, and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. These four considerations--retribution, deterrence, incapacitation, and rehabilitation--are the four purposes of sentencing generally, and a court must fashion a sentence to achieve these purposes to the extent they are applicable in a given case. 18 U.S.C.S. § 3551(a).

Under standard rules of grammar, 18 U.S.C.S. § 3582(a) says that a sentencing judge shall recognize that imprisonment is not appropriate to promote rehabilitation when the court considers the applicable factors of 18 U.S.C.S. § 3553(a)(2); and a court considers these factors when determining both whether to imprison an offender and what length of term to give him. The use of the word "imprisonment" in the "recognizing" clause does not destroy--but instead fits neatly into--this construction. "Imprisonment" as used in the clause most naturally means the "state of being confined" or "a period of confinement." So the word does not distinguish between a defendant's initial placement behind bars and his continued stay there. As the United States Court of Appeals for the District of Columbia Circuit noted in rejecting an identical argument, a sentencing court deciding to keep a defendant locked up for an additional month is, as to that

month, in fact choosing imprisonment over release.  See, *Tapia v. United States*, 131 S. Ct. 2382

(2011)

If Congress had similarly meant to allow courts to base prison terms on offenders'

rehabilitative needs, it would have given courts the capacity to ensure that offenders participate

in prison correctional programs. But in fact, courts do not have this authority. *Id. Tapia* at 2390

In Tapia, the Court sentenced the Defendant to allow him to complete the BOP's 500 Hour

RDAP "Residential Drug Program."  The Supreme Court determined that this type of sentencing

scheme cannot be imposed by the Court.  As the Supreme Court stated:

> As we have held, a court may not impose or lengthen a prison sentence to enable an
> offender to complete a treatment program or otherwise to promote rehabilitation.

*Id. Tapia v. United States*, 131 S. Ct. 2382, 2393 (2011)

As the Honorable Judge Jack B. Weinstein clarified:

Specific Deterrence and Rehabilitation:

> Nothing suggests that the defendants will be rehabilitated or specifically deterred by
> lengthy incarceration.  Resources for providing them necessary education or job training
> are limited. The experience of incarceration will remove them from their families and
> communities and whatever ties they may retain to the non-criminal world. Their peers
> inside prison are unlikely to serve as positive role models. Incarceration will give them
> opportunities to expand their networks of criminal acquaintances, develop antisocial
> behavior patterns and attitudes, and sharpen whatever criminal skills they have acquired on
> the streets.   Upon release, they are likely to return to their broken families and
> impoverished communities with underdeveloped skills, dismal job prospects, and a host of
> the lifelong punishments that are heaped upon ex-convicts in our society, all factors
> inclining them away from straight life and toward recidivism.

*Id. United States v. Bannister,* 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011)

As such, this Court must agree that by sentencing Petitioner to an extended term of

incarceration in order to "rehabilitate,"  is in direct conflict with the Supreme Court's decision in

Tapia, and counsel renders ineffective assistance when she fails to clarify the same to the District

Court.

41

## XII. APPELLATE COUNSEL WAS INEFFECTIVE FOR NOT RAISING NUMEROUS SPEEDY TRIAL ACT VIOLATIONS

Appellate counsel had an obligation to present and argue the speedy trial act (STA) violations on appeal.  These issues were exceptionally meritorious, and had the appeals court granted anyone issue, the indictment would have been dismissed, as there is no harmless error analysis, the issues were:

a)   The STA was violated by 157 day chargeable time pursuant to 18 U.S.C. 3161 only 70 days are allowed;

b)   Petitioner's Sixth Amend. Constitutional right to a speedy trial was violated;

c)   *Zedner v. United States*, 547 U.S. 489 (2006) invalidated all the "prospective STA waivers signed by petitioner, making the STA violated by months, possibly years;

d)   A pro se bail appeal which causes "no delay" does not toll the STA clock during its year long pendency;

e)   The IAD was violated when petitioner was transferred from State to Federal custody back and forth repeatedly.

First, 18 U.S.C. 3161(1)(E) states "delay resulting from any interlocutory appeal"; the district court's decision to deny the motion merely because Petitioner had a bail appeal pending in the Second Circuit which was not decided for a year caused no actual or potential delay in the District Court. The District Court's decision in fact rendered the wording of the STA superfluous by failing to find any "delay" resulting from the *pro se* bail appeal.

*United States v. Kirsh*, 54 F.3d 1062 (2d Cir. 1995) is inapplicable, and easily distinguishable.  We are not speaking on a psychiatric exam which may have had the potential to cause a delay.  When *Zedner v. United States*, 547 U.S. 489 (2006) was decided, the court addressed the STA and its interpretation and found that "prospective" waivers were not authorized by the Act.  This case applies to all *"prospective waivers"* and not simply those that allow a defendant to opt out of the STA.  That is not a correct interpretation of that case and the

42

proof of this lies in the Supreme Court's interpretation of *Bloate v. United States*, 2010 WL 757660.

In the case at bar, there are over five (5) prospective waivers that Petitioner was either forced or duped into signing. Although the District Court cited some general precedent to support its position that "an interlocutory appeal thus <u>automatically</u> tolls the speedy trial clock from its official filing date until the date the disposition of the appeal becomes final." (See Dist. Ct. Order of 11/16/04 at 3). This decision violates *Bloat* clearly, and those cases are not directly on point with the issue and are distinguishable; but more germane is that the appeal was not decided for a "year" an argument that such time was extraordinarily excessive to toll the STA, was strong and valid, and may have resulted in reversal of Petitioner's conviction and dismissal of the indictment. This argument must be viewed in light of *Zedner* (which had just been decided) and what it clearly foreshadowed --- although not explicit – is the statute is to be interpreted "literally." This is implicit in *Zedner* at 763 e.g. "This provision gives the district court discretion – within limits and subject to specific procedures – to accommodate limited <u>delays</u> for case-specific needs." In closing the doors on "prospective waivers," the court adhered to the now axiomatic rule; nothing should be added or taken away from a statute:

> ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.") *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)

The STA clearly says, "delay resulting from any interlocutory appeal." Because the "delay" has to "result from" an interlocutory appeal, if there is no delay to speak of, that subdivision is inapplicable and said time non-excludable. *Zedner* clearly opened the door for this argument by its clear interpretation of the statute. And appellate counsel had an obligation to raise said argument on appeal as it was stronger than any issue raised and had the highest probability of

43

generating a reversal of Petitioner's conviction, see, *Beldayaque v. United States,* 338 F.3d 145, 152 (2d Cir. 2003); *United States v. Mannino,* 212 F.3d 835 (3d Cir. 2000)(Failure to renew objection on appeal); *United States v. Williamson,* 183 F.3d 458 (5th Cir. 1999)(counsel's failure to cite directly controlling precedent). Not only does this apply to the bail appeal exclusion of time, but also the (5) five "prospective waivers" that are on the docket and were signed by Petitioner. *Zedner* clearly addressed this issue and invalidated the use of prospective waivers.

"Conspicuously 3161(h) has <u>no</u> provision excluding periods of delay during which a defendant <u>waives</u> the application of the Act, and it is apparent from the terms of the Act that this omission was a considered one." *Zedner,* at 763. In the face of <u>five</u> "prospective waivers" any Appellate lawyer concerned with being constitutionally effective would have raised *Zedner* the rational in Hanling v. *United States,* 418 U.S. 87, 102 (1974)(claim not precluded on appeal by failure to raise objection at trial because intervening supreme court decision changed law while appeal pending). See *Harris v. Kuhlmann,* 346 F.3d 330, 341 n.5 (2nd Cir. 2003); *O'Connor v. Ohio,* 385 U.S. 92, 93 (1966) (per curium); *Richardson v. United States,* 379 F.3d 485, 487 (7th Cir. 2004)("A court generally applies the law in effect at the time of its decision, and…if the law change while the case is on appeal the appellate court applies the new rule."). And if the court would say this rule of law did not apply since Petitioner was only un-sentenced, Petitioner would have and is arguing Ms. Kellman was again ineffective for not being aware of the new Supreme Court precedent, and renewing the motion to dismiss due to violations of the STA.

Although it could, and would be valid, to say that the "STA" requires all objections and motions for dismissal be raised prior to trial. See, 18 U.S.C. 3162(a)(2), *United States v. Patten,* 826 F.2d 198, 199 (2d Cir. 1987). Appellate counsel could have and should have raised this argument on direct appeal – including all the prospective waivers of the STA based on the

*Zedner* decision, the Government's narrow reading of *Zedner* (Govt. Br. at 42) is only being done to maintain an unjust conviction by any means. Here, unlike *Parisi v. United States,* 529 F.3d 134 (2d Cir. 2008)(cited by the Government at 44), the petitioner "did" challenge the STA prior to trial on specific and general grounds, so that even the *Zedner* issue was preserved for appellate review *United States v. Vonn.,* 535 U.S. 55, 59, N.1 (2002)(claim not raised below "is preserved if made by the current litigant in the recent proceeding upon which the lower courts relied for their resolution of the issue, and [the litigant] did not concede in the current case the correctness of that precedent.") quoting *United States v. Williams*, 504 U.S. 36, 44-45 (1992). Because Petitioner in his speedy trial motion for dismissal challenged "all" the time, from the inception of his federal arrest onward, under a Sixth Amendment Constitutional Right in his brief, this encompasses the "prospective waiver" time as well and thus said issue was preserved for appeal. Just as in *Zedner,* the district court allowed Petitioner to sign a STA waiver that extended past the 70 days authorized by statute (in *Zedner,* it was 91 days, *id.* at 750) *e.g.* from June 27, 2002 until Sept. 13, 2002. Specifically, the court set a general scheduling order "sua sponte" … and when Petitioner's counsel failed to file a single motion in 30 days, the Government simply allowed the next 30 days to elapse and then 14 additional days – 74 days total based on a "prospective waiver," appellate counsel should have challenged this time as not only exceeding the STA but being invalid based on the rationale of *Zedner.* Any appellate lawyer would have briefed *Zedner* and all 5 prospective waivers on appeal, and argued said issue was preserved, based on Petitioner's motion to dismiss.

   In context, appellate counsel raised no issues relative to speedy trial violations any of which could have resulted in a reversal and dismissal of the indictment and according to "*Parisi*" and in the Government's response brief at 44-45, this question may still be an issue of first impression

*e.g.* "... Even now, on this appeal, the question of whether the three stipulations/orders violated the Act remains an open question, one not yet squarely decided either by *Zedner* or this Circuit..." *Id.*

Appellate counsel had everything to gain by raising *Zedner's* application to Petitioner's case, since Petitioner did make a Speedy Trial Motion thereby preserving the issues for appeal. The Government misconstrues the facts of Petitioner's case in applying "*Parisi.*" *Parisi's* counsel failed to file a STA motion to dismiss and the Second Circuit merely held he was not ineffective since *Zedner* had not yet been decided. Here the STA motion was made and preserved. *Zedner* was decided and appellate counsel failed to present the issues on appeal.

Now comes *Bloate v. Untied States,* 2010 WL 757660, which again confines itself to the strict language of the STA and holds that time to prepare pre-trial motions is not automatically excludable over-ruling *Untied States v. Oberroi,* 547 F.3d 436 (2nd Cir. 2008) and (every circuit that reached similar conclusions) in Petitioner's case, there was numerous time for the preparation of motions that should have been challenged and noteworthy is at the time of Petitioner's appeal. This also was an issue of first impression. In the general challenge, Petitioner had argued that the indictment should be dismissed because his constitutional right to a speedy trial had been violated. One of the main issues presented was that the preparation of pretrial motions time should not be counted against petitioner, since the BOP was deliberately undermining Petitioner's ability to prepare said motions *pro se.* Appellate counsel failed to raise this argument on appeal as well. Now that *Bloate* makes clear such time is not automatically excludable and it was an issue of first impression at the time of Petitioner's appeal, this issue should have been raised by appellate counsel.

46

*Bloate*, reinforces the correctness of *United States v. Tinklerberg*, 579 F.3d 589 (6th Cir. 2009) (Dkt. No. 08-1765)[11] where the Sixth Circuit Court of Appeals has split with all the other circuits in holding that there must be some actual "delay" in order for there to be excludable time. The *Tinklenberg* court stated, "<u>We disagree and hold that a pretrial motion must actually cause a delay, or the expectation of a delay, of trial in order to create excludable time...</u>" This applies with equal force to the bail appeal. Any attorney would have looked at the various STA (issues) violations, the fact that said violations had been objected too at the district court level and presented them in their brief. The STA issues in this case are complex and have merit and although the district court may be reluctant to dismiss the indictment, the Court of Appeals noting that just as in *Zedner* petitioner's case did not go to trial from 2002 until 2005, in which the Government superseded Petitioner's indictment several times, the Court of Appeals may have found a Speedy Trial violation and ordered dismissal of the indictment, *Tinklerberg*. Under *Strickland*, appellate counsel knew or should have known of *Zedner* and realized its applicability and what it foreshadowed, and but for counsel's error, the outcome of Petitioner's appeal may have been different.

In *Bloate v. United States,* 130 S.Ct. 1345, 176 L. Ed. 2d 54 (2010), the Court explicitly abrogated *Oberroi,* along with decisions of seven other Courts of Appeals, and interpreted the scope of § 3161(h)(1)(D) more narrowly. Relying principally on the statutory language -- which permits the exclusion of "delay resulting from any pretrial motion, from the filing of the motion through the . . . disposition of[] such motion" -- the Court held that delays resulting from mere preparation of pretrial motions are not automatically excludable under § 3161(h)(1)(D). See <u>*Bloate, 130 S.Ct. at 1353*</u> (emphasis added). Rather, the Court found that such delays may only be excluded pursuant to the ends-of-justice provision, provided that the trial court makes the

---

[11] Overruled on other grounds.

appropriate case-specific findings that the benefits outweigh the costs, as required by §
3161(h)(7). *Id.* at 1353-54. See also, *United States v. Huete-Sandoval*, 668 F.3d 1, 4 (1st Cir.
P.R. 2011)

From August 1, 2002 no motions were filed until September 3, 2002. In other words,
once there were no motions filed by Petitioner, the Government and the court were required to
call Petitioner back into court to find out the status of said motions and not simply allow the time
to run out. The same is true for the court which would have had the case under advisement for
09/03/2002. Further *United States v. Oberroi*, 547 F.3d. 436 (2nd Cir. 2008), cannot apply since
it was overruled by *Bloate, supra.* the "creation of a new legal principle." *Cf, Policano v.
Herbert,* 2005 WL 3046798 (2nd Cir. 2005)  The same is true for September 13, 2002 thru
October 11, 2002 dates as there was a prospective waiver not covered by statute.

Between August 1, 2002 and September 03, 2002 nothing occurred. Since the Court agreed
that Petitioner was short 7 days in the Speedy Trial calculations, all that is required that the dates
between August 1, 2002 and September 03, 2002 where no motions were filed, which takes the
calculations over the 7 days the court relied upon. As such, this Court must agree that appellate
counsel had an obligation to argue the issue on appeal as a matter of first impression. The case
was developing on the matter with current briefing before the Supreme Court in *Bloate* at the
time. Had the issue been preserved on appeal, the *Bloate* decision would have overturned the
conviction and sentence.

Appellate Counsel did not raise the issue on appeal notwithstanding this Court's 20-page
order on the matter.

**A. Interstate Agreement on Detainers – Appellate Issue**

The IAD was violated and does apply to pre-trial detainees; the IAD applies to "a person (who) has entered upon a term of imprisonment in a penal or correctional institution." Articles III(a) and IV(a).

Further, under Article II(b), "sending state shall mean a state in which a prisoner is incarcerated at the time..."

Article II(c) states "receiving state shall mean the state in which trial is to be had on an indictment, information or complaint pursuant to Article III or Article IV hereof."

Nowhere in the IAD does it say that the IAD does not apply if the person in the "sending State" is not yet convicted of a crime.  And a person "enters upon a term of imprisonment" when s/he is incarcerated in lieu of bail being paid or denied bail until trial or even until a bail hearing can be had.  These are all "terms" of imprisonment that are definite.

And the phrase "penal or correctional institution" (Article III) gives credence that the IAD applies universally to all persons who have entered a term of imprisonment in one state sovereignty and have outstanding charges via complaint or indictment in another jurisdiction. That once a person is sent to the "receiving state," trial must be had within 180 days and prior to said person being returned to the "sending state."  *Alabama v. Bozeman*, 533 U.S. 146 (2001). Under the statutory definition of "sending state," Petitioner meets the criteria to clearly fall within the ambit of the IAD.  And if the statute is found in anyway to be ambiguous, the Rule of Lenity or liberal construction should be applied.

The U.S. Supreme Court has never addressed this issue, and Petitioner is not certain the Second Circuit has squarely addressed or dealt with the question as presented.  The facts stated more fully in the initial 2255 are clear the anti-shuttling clause of the IAD was violated

49

repeatedly when Petitioner was sent back and forth to state custody from federal custody and vice versa for over a year. And there is no reason counsel did not raise this issue in her brief. See *United States v. Knight*, 562 F.3d 1314 (11th Cir. 2009).

If a violation exists and on the proceedings had in this case the probability is high that a STA violation did occur, the result if raised was mandatory and any competent attorney would have zealously pursued said claims.

In *Knight*, the Government argued and was rejected on the same point by the Eleventh Circuit Court of Appeals, "The United States argues that the Detainers Act is not applicable because a detainer never was filed against *Knight* and because he was not "serving a term of imprisonment" when awaiting trial, but we disagree." *Id. Knight* at 1325.

The court went on to state the Detainers Act applies "when [the United States] activates its provisions by filing a detainer against a state prisoner and then obtains his custody by means of write of habeas corpus ad prosequendum." Citing *United States v. Mauro*, 436 U.S. 340 (1978). The court further recognized "The Detainers Act also applies to a prisoner 'serving a term of imprisonment in any party state.'" *Id.* 1326.

In this case, an arrest warrant was issued on May 8, 2002 as well as a writ of habeas corpus ad prosequendum on the same date. (See Dkt. Sheet for the same date) An Order of Detention was entered on the docket May 25, 2002 and there are numerous writs of habeas corpus ad prosequendum. Thus because Petitioner was sent back to state custody repeatedly in 2002 and 2003, prior to any trial or final disposition of the federal case and said trial did not occur within 120 days of his arrival in custody federally, the indictment must be dismissed of *Knight,* at 1326 and such dismissal is mandatory and not subject to harmless error analysis. See <u>Alabama v.</u>

50

*Bozeman,* 533 U.S. 146 (2001) and *Zedner.*   Appellate counsel had an obligation to raise this issue in the brief.

## CONCLUSION

Wherefore, for all the reasons raised in the original Title 28 U.S.C. § 2255 and this reply brief, Petitioner respectfully prays this Honorable Court grant the issues raised, vacating Petitioner's sentence and conviction.

Done this ___, day of November 2012

Demetrius Hill
Reg. # 68133-053
FCI Oakdale
Federal Correctional Institution
P.O. Box 5000
Oakdale, La  71463

## CERTIFICATE OF SERVICE

I HEREBY DO CERTIFY that a true and correct copy of the foregoing motion was mailed to: Richard T. Donoghue, Esq., Assistant U.S. Attorney, 601 Federal Plaza, Central Islip, New York 11722-4454 by placing the same in the Federal Prison Legal Mailbox with sufficient First Class Postage.

Done this _____, day of November 2012

Respectfully submitted,

Demetrius Hill
Reg. # 68133-053
FCI Oakdale
Federal Correctional Institution
P.O. Box 5000
Oakdale, La  71463

LAW OFFICE OF
# KEVIN J. KEATING
SUITE 501
666 OLD COUNTRY ROAD
GARDEN CITY, NEW YORK 11530-2004

(516) 222-1099

TELECOPIER
(516) 683-8410

KEVIN J. KEATING
─────
SANDRA McILVEEN

MANHATTAN OFFICE:
EMPIRE STATE BUILDING
350 FIFTH AVENUE, SUITE 5411
NEW YORK, N.Y. 10118-0110
(212) 964-2702

June 26, 2002

Honorable Abbey L. Boklan
County Court Judge
Nassau County Court
262 Old Country Road
Mineola, NY  11501

Re:   <u>People v. Demetrius Hill</u>

Indictment No. 901N-2002

Dear Judge Boklan:

In accordance with my conversation with Ms. Cruise on June 24, 2002, please be advised that I have been retained by Demetrius Hill in the captioned matter and, accordingly, will be substituting for prior counsel Louis Milone.

Accordingly, please consider this letter my entry of a Notice of Appearance on Mr. Hill's behalf.

I will appear on the next scheduled date of July 16, 2002.

Thank you for your consideration.

Very truly yours,

KEVIN J. KEATING

KJK:jv

# PERINI & HOERGER

**ATTORNEYS AT LAW**

1770 MOTOR PARKWAY

SUITE 300

HAUPPAUGE, NEW YORK 11749

EX.B

RAYMOND G. PERINI
MAUREEN S. HOERGER

WAYNE J. DONOVAN

(631) 232-2224
FAX (631) 232-2344

September 29, 2003

Honorable Denis R. Hurley
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

**Re:    United States v. Demetrius Hill**
**Docket No. 02-CR-728 (DRH)**

Dear Judge Hurley:

At the Court's request I visited Mr. Hill at the Metropolitan Detention Center's Special Housing Unit on Friday to discuss with him the competency report and the issue of whether to have a hearing or waive it, as part of the process of determining whether he can proceed pro se.

In doing so, we discussed a general overview of his two cases, the various legal issues involved and some of the requirements for trial preparation.  I found that Mr. Hill was, as the doctor's report indicated, intelligent, conversant with the nature of the charges against him and firmly grounded in reality.  After our discussion, it was determined that he would not contest the findings of the report when he appears in Court next.

I also discussed with him the advisability of at least accepting the services of a legal advisor, if not legal representation.  It appears that Mr. Hill's primary motivation in appearing pro se is that he does not feel he has adequate time to consult with counsel about crucial stages of his case.  He claimed to have only one counsel visit in his entire 20 months of incarceration, and that all preparation so far has had to be done during limited phone calls and in the lockup.

It is clear that Mr. Hill has a non-frivolous defense to both cases, which are essentially unrelated, and that he requires assistance in preparing for trial. There are a number of sophisticated legal issues, such as the use of the proffer statement which he will need assistance in addressing.  Despite the fact that he is fairly conversant with a great deal of case law, this is a particularly difficult issue.

Honorable Denis R. Hurley
September 29, 2003
Page Two

In addition, the second trial, which revolves around an event that took place at the Metropolitan Detention Center in Brooklyn, is a circumstantial case which will involve the interviewing of a substantial number of witnesses--perhaps as many as eight or ten--all of whom work in Brooklyn or Manhattan.  Mr. Hill will not be able to do that from the Special Housing Unit and he makes a legitimate point that events such as the tape recording of his primary defense witness by the government during one of his phone calls, is likely to have a chilling effect on witnesses coming forward to assist him. Therefore, someone outside the institution is going to have to conduct these interviews and attempt to secure testimony for him.

Mr. Hill would have been willing to accept my services as a legal advisor; however, it is just not practical for someone from Eastern Long Island to undertake representing him in this matter given that he cannot be moved closer to the Courthouse.  Even on the eve of the recent holidays, it took me 4½ hours just to travel to see Mr. Hill and return. Normally it takes at least 5 hours.  His case, I would estimate, will take about 15 to 20 hours of jail visits to prepare, in addition to preparation of motions and interviewing witnesses.  A practical solution would be to appoint an attorney from the Brooklyn panel who would not have to sacrifice an entire day's work for each visit and who would be located near the witnesses.  Mr. Hill might even eventually agree to accept counsel's legal services if he were able to develop a rapport with the lawyer.

I have discussed the advisability of the application for a legal advisor with Mr. Hill and he has requested that I make it on his behalf, in the event that the Court finds that he can proceed pro se.

Sincerely,

**PERINI & HOERGER**

Maureen S. Hoerger /ca

Maureen S. Hoerger

cc:  AUSA Richard Donoghue
      Demetrius Hill

# ISU

## INVESTIGATIONS & SECURITY UNLIMITED

AFFIRMATION                        EX.C

UNITED STATES OF AMERICA
PLAINIFF
V

DEMETRIUS HILL
DEFENDENT

Cr. 02-0728(DRH)

RODNEY S. JONES, afffirms the following:

On April 8,2004, I went to interview the following witnesses in Clemont, New Jersey, Ada Patricia Skilling, Michael Zae Skilling, and Alvine Collin.

During the interview, the three(3) individuals were asked whether they would cooperate if askked upon to testify at any hearings and/or trial, and their answers were, yes they would cooperate.

I was told by Michael Zae Skilling,that he testified at a Suppession Hearing in the past, whereas, Ada Paticia  Skilling and Alvine Collin were willing to testify, but, was never called upon to testify by Kevin Keating, Defense Attornry.


_____
Rosney S. Jones Sr.
Private  Investigator


Sworn to before me this
30th dateof April, 2004

_____
Notary Public

JERRY L. TRITZ
Notary Public, State of New York
No. 30-4706201
Qualified in Nassau County
Commission Expires April 30, 2007

P.O. Box 120425 · ST. ALBANS, NY 11412 · Cel. (917) 403-9420 · Pager (917) 618-8860



**ISU**

EX. C

# INVESTIGATIONS & SECURITY UNLIMITED

AFFIRMATION

UNITED STATES OF AMERICA
PLAINIFF
V

DEMETRIUS HILL
DEFENDENT

Cr. 02-0728(DRH)

RODNEY S. JONES, afffirms the following:

On April 8,2004, I went to interview the following witnesses in Clemont, New Jersey, Ada Patricia Skilling, Michael Zae Skilling, and Alvine Collin.

During the interview, the three(3) individuals were asked whether they would cooperate if askked upon to testify at any hearings and/or trial, and their answers were, yes they would cooperate.

.I was told by Michael Zae Skilling,that he testified at a Suppession Hearing in the past, whereas, Ada Paticia Skilling and Alvine Collin were willing to testify, but, was never called upon to testify by Kevin Keating, Defense Attornry.

_Rosney S. Jones Sr._
Private Investigator

Sworn to before me this
30th dateof April 1, 2004

Notary Public

JERRY L. TRITZ
Notary Public, State of New York
No. 30-4706201
Qualified in Nassau County
Commission Expires April 30, 19 2007

P.O. Box 120425 · ST. ALBANS, NY 11412 · Cel. (917) 403-9420 · Pager (917) 618-8860

EX. D

# AFFIDAVIT

Sandra Escalera, being duly sworn states the following:

1.      I know Demetrius Hill, and knew him prior to his incarceration on Feb. 13, 2002.

2.      I know Sarah Guzman and knew her prior to Feb. 13, 2002.

3.      I knew Michael Skillings prior to his death in Feb. 2002.

4.      I know Omar Lutsey and knew him prior to Feb. 13, 2002.

5.      I know Daniel Skillings and met him several times through his brother Michael Skillings.

6.      I have been in the presence of these individuals and know their characters.

7.      From 2002 when Demetrius Hill was incarcerated until 2005, Demetrius had called me periodically and requested that I be a witness on his behalf. I've always agreed and prior to his trial, he contacted me and asked that I come to see him, and I did go to see him at the Brooklyn MDC. I went over my testimony with him and he stated that I should contact his stand-by attorney Susan G. Kellman.

8.      I repeatedly called Ms. Kellman even during the time Mr. Hill was on trial. Ms. Kellman never returned any of my calls. When I explained to Ms. Kellman's secretary that I was to be a witness on Mr. Hill's behalf, she claimed to be unaware of any witnesses, but stated Ms. Kellman would return my call that day. Ms. Kellman never contacted me, and this is why I never testified on Mr. Hill's

behalf.  I had every intention of testifying for Mr. Hill, as I know facts relevant to the case, and know <u>all</u> the individuals involved.

9.    I make this affidavit voluntarily, and without receiving anything of value from anyone for providing it.  My only hope is that it may assist Mr. Hill in finally obtaining justice and freedom.

Respectfully,

Sandra Escalera

Sworn to before me
this _____ day of _____, 2010


_____

Notary Public



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X
UNITED STATES OF AMERICA,

      -against-                <u>ORDER</u>
                                 02-CR-0728(DRH)(ETB)

DEMETRIUS HILL a/k/a
DEMETRIUS CAPONE a/k/a
MEECHIE HILL,

                Defendant.
------------------------------X
A P P E A R A N C E S :

For the Government:
    Roslynn R. Mauskopf
    United States Attorney
    Eastern District of New York
    Alfonse M. D'Amato Federal Courthouse
    Federal Plaza
    Central Islip, New York 11722
      By: Richard P. Donoghue, A.U.S.A.

For Defendant:
    Susan G. Kellman, Esq.
    25 8th Avenue
    Brooklyn, New York 11217

HURLEY, District Judge

      Demetrius Hill ("Hill") was convicted of various crimes
on February 16, 2005.  To date, he remains unsentenced.

      At defense counsel's request, arrangements were made to
transfer defendant from USP Lewisberg to a nearby detention
center to facilitate client/counsel meetings preparatory to
sentence.

      On October 17, 2005, the Court held a status conference
following defendant's return to this jurisdiction.  At that
conference, a post-trial briefing schedule was established.
Under that schedule, any defense motions were to be filed by
December 1, 2005, with the government's response being due on
December 5th, and any response by the movant being due by

December 14th.  Also at the October 17, 2005 status conference, a
sentencing date of January 27, 2006 was scheduled.

No defense motions were received by the December 1,
2005 date.  Rather, defense counsel sent a letter to the Court
dated December 18, 2005 asking the Court "to use [the] January
27, 2006 sentencing date for a status conference."  (Def.'s Dec.
18, 2005 Letter at 1.)  Counsel advised that at that time she
would be in a better position to advise the Court "regarding the
progress of my work with Mr. Hill."  By letter endorsement dated
December 19, 2005, that application was denied and both parties
were directed "to be ready to proceed to sentence on January 27,
2006, as scheduled." (See Letter Endorsement of Dec. 19, 2005 to
Defense Counsel's Letter of Dec. 13, 2005.)

Defense counsel by letter dated January 23, 2005 (sic;
should read 2006), requested the Court to revisit its earlier
ruling denying an adjournment of the sentencing date, proffering
that:

> Up to and including this week, counsel has
> been involved in a civil trial which has
> consumed a great deal of counsel's time.  Mr.
> Hill has asked counsel to explore a great
> many issues and I have been unable to . . .
> review [the] cases provided by Mr. Hill.  In
> addition, Mr. Hill and I have not had an
> adequate opportunity to review the
> PreSentence Investigation Report.  To the
> extent that I will be on trial on Tuesday,
> Wednesday and Thursday of this week, it will
> be impossible to complete the necessary work
> preparatory to Mr. Hill's sentence.
>
> Accordingly, I respectfully request that the
> Court grant counsel a modest adjournment of
> one month.

-2-

(Def.'s Jan. 23, 2006 Letter.)

Although the Court is underwhelmed by the nature and timing of the current request, circumstances — including the fact that defense counsel reports that she has not yet appropriately "review[ed] the PreSentence Investigation Report" with Hill, and will be on trial through Thursday of this week — essentially requires that the requested relief be granted.  For that reason, it is.  The government, defense counsel, and Hill shall be present on January 27, 2006 at 11:00 a.m. so the necessary steps may be taken to assure that the sentencing will occur on February 27, 2006 (beginning at 10:30 a.m.), i.e. the date requested by defense counsel.

            SO ORDERED.

Dated: January 24, 2006
       Central Islip, New York


                                        _____
                                        DENIS R. HURLEY, U.S.D.J.


                                -3-

*EX F*

15

be merit to it.  I haven't read the motion papers, but it's somewhat unusual.  It doesn't mean it isn't well-founded.  I never had -- when I sat in Brooklyn, I never had a motion to transfer it out here or vice versa since I've been out here, since I've been out in Central Islip or Hauppauge previously, I haven't had a motion akin to the one you're mentioning.

Of course, there are a lot of civil cases. Change of venue, I think, under 1404 and I think most of those are typically at least unsuccessful when you're talking about a distance of 40 miles.  There can be extenuating circumstances, and I acknowledge that.  I do appreciate you giving me more insight into the nature of the change of venue motion.

MR. TRITZ:  Let me say this, Judge.  In the months that I've known Mr. Hill, when I first went to see him at the MDC, it was a bit of a circus.

They would drag him out shackled to bring him 30 yards.  They would bring him out shackled, hands and feet, waist chains on video cameras held up to videotape, the transition of the 30 yards to a glass enclosed room where I would meet with him.

Candidly, he did not treat the correction officers with very much respect and it was a very difficult situation.

16

Since he's been in the MCC, there's been a change. He understands that if he wants the privilege of meeting with counsel in the counsel visiting area, he has to conduct himself in an appropriate way and he appears to have endeavored to have done that. He doesn't have the problems that he had before. Indeed, there use to be -- I think they call them shots -- filed against him on a regular basis because of his conduct. That really has stopped.

He has produced four motions that are very substantially, I believe, are well-founded and well written and he has done this all while being in the special housing unit.

He lives in a cage. He has not had family visits in more than a year. He has not had family telephone calls for the same period of time. And, yet, he has concentrated on his material.

Now, maybe we suffer from the problem that he has little else to concentrate on than this case and that this case is -- his whole being is focused on this case and given the opportunity he would have his team in that institution seven days a week, weekends included, working on his case. I have never seen a client who is more dedicated to his defense than Mr. Hill is.

Now, while it is a pain in the neck to me, I

17

must admit I'm not thrilled about it but I can't condemn
him for it.  He has worked diligently and been productive
under the most adverse conditions and not getting any
support from the institution to the point where --

THE COURT:  Is that a fair statement, do you
think?

MR. TRITZ:  I think it is, to the point I'm
going to make.

Certainly, look, the warden came and saw him and
said to him; Mr. Hill, you straightened out, we will see
what we can do.  The next thing, he straightens out and
he's downstairs in the counsel room.  He got moved out of
the 10th floor where they keep the trade center bomber
type people and he's down in 9C, which is the special
housing unit where they keep the problem people but not
the people that are completely segregated.

THE COURT:  I think the record would incorporate
all the correspondence and all, but we do know that the
correctional facility, for a period of time, certainly
endeavored to accommodate both this Court and Mr. Hill.

And we know that because we have been told he
was on the phone three hours a day.  We also know that
Ms. Playter spent five, six hours with him almost daily
for a period of time.

It doesn't sound like they had him locked up in



*Law Offices of*
## Susan G. Kellman
*Attorney at Law*

*25 8th Avenue*
*Brooklyn, New York 11217*

*Telephone: (718) 783-8200*
*Telecopier: (718) 783-8226*
*e-mail: kellmansg@aol.com*

January 6, 2004

Mr. Demetrius Hill
Inmate # 68133-053
Metropolitan Detention Center
80 29th Street
Brooklyn, New York 11232

**Re: Replacement Tape**

Dear Demetrius,

Enclosed is a replacement tape for November 14, 2004.  Please confirm receipt of this tape so that I can cross it off of my list.

I played phone tag with Rodney today, so I don't yet know how he is doing with the witnesses...will keep trying.

Very truly yours,

Susan G. Kellman

EX G

Susan G. Kellman
Attorney at Law
25 Eighth Avenue
Brooklyn, New York 11217
(718) 783-8200

January 20, 2005

Mr. Demetrius Hill
Inmate # 68133-053
Metropolitan Detention Center
80 29th Street
Brooklyn, New York 11232

**Re: Conspiracy Research**

Dear Demetrius,

Here is the research you wanted.  No reason to print Krulewitch – this is horn book law – there is no question that "knowledge" is an essential element of conspiracy – moreover, "mere presence" and/or "mere association" and/or "presence together with association" – even at the scene of a crime...without evidence of "knowing" participation...and in the case of a conspiracy... "knowing" involvement, as exemplified by discussions, etc. – not sufficient to make out conspiracy.

Spoke to Keating...was hoping he might be able to shed some light...not much help. Please make a chart for me of which witnesses you intend to call and what you anticipate each witness will say. Thanks, see you Monday.

Very truly yours,

Susan G. Kellman

# United States District Court

*Eastern* **DISTRICT OF** *New York*

*United States of America*

v.

*Demetrius Hill*

**SUBPOENA IN A CRIMINAL CASE**

EX. H

CASE NUMBER:

TO: *Almre L. Collin*
*2604 Pine Hill Gardens*
*Pine Hill, NJ 08201*

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date and time specified below, or any subsequent place, date and time set by the court, to testify in the above referenced case. This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| PLACE *United States District Courthouse* *Eastern District of New York* *100 Federal Plaza* *Central Islip, New York 11722-4438* | COURTROOM *Hon. Denis R Hur.* |
| --- | --- |
| | DATE AND TIME *Feb. 2, 2005, 10 am* |

☑ YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):
*You are requested to appear to testify on behalf of Demetrius Hill on the aforementioned date in the above matter.*

| U.S. MAGISTRATE JUDGE OR CLERK OF COURT **ROBERT C. HEINEMANN** | DATE *1/5/05* |
| --- | --- |
| BY DEPUTY CLERK | |

ATTORNEYS NAME ADDRESS AND PHONE NUMBER
*SUSAN G. KELLMAN, Esq  (718) 783 8200*
*25 8ᵗʰ Ave*
*Brooklyn, NY 11217*

# United States District Court

*Eastern* DISTRICT OF *New York*

EX.H

*United States of America*

v.

*Demetrius Hill*

**SUBPOENA IN A CRIMINAL CASE**

CASE NUMBER: *02 Cr. 0728 (1)x*

TO: *Ada Patricia Skilling*
*206 Hobart Drive*
*Clement, NJ 08021*

☑ YOU ARE COMMANDED to appear in the United States District Court at the place, date and time specified below, or any subsequent place, date and time set by the court, to testify in the above referenced case. This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| PLACE *United States District Court House* *Eastern District of New York* *100 Federal Plaza* *Central Islip, New York 11722-4438* | COURTROOM *Hon. Dennis R. Hurley* |
| | DATE AND TIME *Feb. 2, 2005 @ 10AM* |

☑ YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):

*You are requested to testify on behalf of Demetrius Hill on the aforementioned date in the above matter.*

| U.S. MAGISTRATE JUDGE OR CLERK OF COURT | DATE |
| **ROBERT C. HEINEMANN** | *1/5/05* |
| BY DEPUTY CLERK | |

ATTORNEY'S NAME, ADDRESS AND PHONE NUMBER *Susan G. Kellman, Esq.*
*25 8th Avenue*
*Brooklyn, NY 11217*
*(718) 783 8200*

Case 2:09-cv-04499-DRH   Document 30-1   Filed 12/10/12   Page 20 of 23 PageID #: 539

# United States District Court

_Eastern_ _____ **DISTRICT OF** _New York_

_United States of America_

v.

_Demetrius Hill_

**EX. H**

## SUBPOENA IN A CRIMINAL CASE

CASE NUMBER: _02 Cr. 0728(_

TO: _Michael Zeane Skilling_
_206 Hobart Drive_
_Clement, NJ 08021_

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date and time specified below, or any subsequent place, date and time set by the court, to testify in the above referenced case. This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| PLACE _United States District Courthouse_ _Eastern District of New York_ _100 Federal Plaza_ _Central Islip, New York 11722-4438_ | COURTROOM _Hon. Denis R. Hurley_ |
| | DATE AND TIME _Feb. 2, 2005, 10am_ |

☑ YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):
_you are requested to testify on behalf of Demetrius Hill on the aforementioned date in the above matter._

| U.S. MAGISTRATE JUDGE OR CLERK OF COURT **ROBERT C. HEINEMANN** | DATE _1/5/05_ |
| BY DEPUTY CLERK | |

ATTORNEY'S NAME, ADDRESS AND PHONE NUMBER
_Susan G. Kellman, Esq._
_25 8th Avenue_ _(718) 783-8200_

EX.I

*Law Offices of*
*Susan G. Kellman*
*Attorney at Law*

*25 8th Avenue*
*Brooklyn, New York 11217*

*Telephone: (718) 783-8200*
*Telecopier: (718) 783-8226*
*e-mail: kellmanesq@aol.com*

January 7, 2004

Richard Donoghue, Esq.
Assistant United States Attorney
Eastern District of New York
610 Federal Plaza
Center Islip, New York 11722

Re: **United States v. Demetrius Hill**
**(S-3) 02 Cr. 728 (DRH)**

Dear Mr. Donoghue:

I write to express Mr. Hill's concerns regarding two important matters in connection with the upcoming trial of the above-referenced matter.

First, as of this date, Mr. Hill has not yet received an operable tape player. He reports that he has received a tape player without batteries on one occasion and without headphone on a second occasion. Without a tape player he is unable to adequately prepare for trial since he needs to review the taped conversations overheard at the MDC and the Passaic County Jail and provided by your office.

As of this date, neither Mr. Tritz, Mr. Hill nor myself have received any transcripts of these conversations. Is it the government's intention to use any of these conversations? And, if so, when can we anticipate receiving transcripts?

Finally, in my discovery letter of December 21, 2004, I requested, at Mr. Hill's request, the specific dates and times of the specific robberies charged in the superceding indictment. Without this information it is impossible to determine whether Mr. Hill can assert alibi testimony. Please advise.

Thank you for providing the tape of November 14 and for your continued cooperation.

Very truly yours,

Susan G. Kellman

cc: Demetrius Hill



Federal Correctional Institution
Oakdale, LA 71463

"The enclosed letter was processed through special mailing procedures for forwarding to you. The letter has been neither opened nor inspected. If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return the material for further information or clarification. If the writer encloses correspondence for forwarding to another addressee, please return the enclosure to the above address."

11-7-12

Legal mail
open only in presence
of
prisoner